ISAAC SELIGMAN

*v.*

VICTOR TALKING MACHINE COMPANY.

[Decided July 12th, 1906.]

Where testimony of a number of disinterested witnesses showed that the continued operation of defendant's manufacturing plant in the same block with plaintiff's dwelling caused noises and vibrations which prevented the inhabitants from sleeping during the night, plaintiff was entitled to an injunction restraining the operation of the plant during the night, although other residents in the same locality testified that their rest was not disturbed.

Heard on bill, answer, replication and proofs in open court.

*Messrs. French & Richards,* for the complainant.

*Messrs. Grey & Archer,* for the defendant.

GARRISON, V. C.

This is a bill filed by Isaac Seligman against the Victor Talking Machine Company, complaining of an alleged nuisance. The plant of the defendant company and the dwelling-house of the complainant are each in a block of land in the city of Camden practically square, bounded on the west by Front street, on the east by Second street, on the north by Cooper street and on the south by Market street. The dwelling of the complainant, No. 117 Market street, abuts on the west a line drawn north

and south through the centre of the block. The defendant now owns all the land north from a line drawn east and west through the centre of the block.

Market street is one of the principal streets of the city, and on it, in this block at the time complainant came there to live in 1878, there dwelt some of the most prominent and influential men of the city, among them Abraham Browning, Peter L. Voorhees and James B. Dayton. There were at that time nothing but residences in the block with two exceptions—there was a blacksmith shop almost immediately north of and in the rear of complainant's lot, and there was a carriage factory on the Front street side of the block a little to the south of the middle thereof. The entrance to the blacksmith shop was from Front street, but the shop itself stood far back from the street, as above described. Subsequently this building was used as a machine shop, and about ten years ago was used by the originator of the Victor talking machines as a place in which to manufacture his machines.

The Victor Talking Machine Company was incorporated in 1901. It has erected many large buildings on the lands owned by it, and it first operated the machinery therein from a one hundred and twenty-five horsepower engine, located in a building on the north side of the block about one hundred and sixty-five feet northwest from the north end of complainant's house. In August of 1905 the defendant completed a building the nearest point of which is about one hundred and twenty feet from the complainant's house, and is so located that if the east line of complainant's lot was projected it would form the west line of the building. In this building, which is of two stories, there was installed upon the ground floor two boilers capable of generating steam of a combined capacity of six hundred horsepower. On the second floor were installed two engines and dynamos or generators of a combined capacity of three hundred and seventy-five horsepower. The balance of the horsepower of the steam was utilized for heating tables to heat the metal records used in the talking machines and also to furnish electric lighting for the plant, to run pumps and other machinery.

Some time in the winter of 1905 the defendant company in-

augurated a new method of distributing to their customers the
records used in the talking machines, and, by reason of such
new method of distribution, were compelled at certain times to
operate their machinery continuously from six o'clock in the
morning until late hours at night, and finally until four o'clock
in the morning. This machinery, so operated, was located in
the building last described, and it is the noise and vibrations
therefrom of which complaint is made.

The vibrations are shown to be about of the same character
and intensity as those occasioned in the same building by the
passage of trolley cars or of heavily-loaded trucks, the only dif-
ference being that those occasioned by the machinery were con-
tinuous.

I am satisfied from the proofs that, so far as the making of
noise or the causing of vibrations are concerned, the machinery
in this factory is properly installed and carefully operated and
does not cause any more noise and vibrations than usually ac-
company or are incident to the operation of any considerable
amount of machinery using steam. In other words, I think
that the situation is that of an ordinary manufacturing plant
producing the ordinary noises of such an establishment, and if
it were operated only during the hours of the day when such
plants are customarily operated, it would not be subject to
restraint upon the proofs in this suit.

The complainant, although the prayer of his bill is broad
enough to cover such restraint, does not, as a fact, ask for it.
He limits his application to a prayer that the defendant be
restrained from operating during such hours of the night as
are necessarily devoted by him and his family to rest.

This raises the question whether a manufacturing establish-
ment, which has come into a city block theretofore free from
annoying noises and vibrations, may operate its machinery with
the usual noise and vibration accompanying the same during
the hours of the night usually devoted to rest, if the effect of
such customary noise or vibration at the unusual hour is to
keep awake those dwelling adjacent to the plant?

There is, of course, no reason in law why a manufacturing
establishment may not operate throughout the entire twenty-

four hours if it causes no actionable or legal wrong to others. It is well recognized, however, in cases of nuisance, that the things to be taken into account include not only the degree and character of the annoyance and the circumstances under which it occurs, but also the time of its occurrence. As is well said by Vice-Chancellor Pitney, in *Gilbough* v. *West Side Amusement Co., 64 N. J. Eq. (19 Dick.)* (at *p. 28*) *(1902)*: "So the time when a noise is made is also to be taken into account. Mankind needs sleep for a succession of several hours once in every twenty-four hours, and nature has provided a time for that purpose, to wit, the night time, and by common consent of civilized man the night is devoted to rest and sleep, and noises which would not be adjudged nuisances, under circumstances, if made in the day-time, will be declared to be nuisances if made at night, during the hours which are usually devoted by the inhabitants of that neighborhood to sleep."

Many other authorities are to the same effect. *Kerr Inj. (3d ed.)* *216, note 37; *Wood Nuis. (2d ed.)* § 613; 21 Am. & Eng. Encycl. L. (2d ed.) 697, note 3.

It is not disputed in the case at bar that the noises and vibrations complained of exist, and that when the plant was in operation at night they seriously affected some of those in the neighborhood. The gravamen of the defence is that those who were thus affected were persons of extraordinary sensibility and were not such as the law would protect by injunction by reason thereof.

The complainant and the three other members of his family were undoubtedly guilty of exaggeration, more, however, in describing the effects upon them of the annoyances than with respect to the character or degree of the annoyances. The other witnesses for the complainant are not, however, open to any such charge, and the undisputed facts are that there was the hum or whirr of this heavy machinery, the pounding or pulsating thereof, the noise of the exhaust of the steam and the continuous vibration conveyed through the earth to the walls of the adjacent houses. In addition to that which emanated from the machinery itself, there were the noises occasioned by removing the metal discs from the presses, which operation required

the dropping of heavy masses of metal a distance of several inches upon a metal-topped table:

The standard to guide the court is well stated by Chancellor Zabriskie, in *Ross* v. *Butler, 19 N. J. Eq. (4 C. E. Gr.) 294* (at *p. 298*) *(1868)* : "The law takes care that lawful and useful business shall not be put a stop to on account of every trifling or imaginary annoyance such as may offend the taste or disturb the nerves of a fastidious or over-refined person. But, on the other hand, it does not allow anyone, whatever his circumstances or condition may be, to be driven from his home, or to be compelled to live in it in positive discomfort, although caused by a lawful and useful business carried on in his vicinity. The maxim *sic utere tuo ut alienum non laedas,* expresses the well-established doctrine of the law. It is not necessary, to constitute a nuisance, that the matter complained of should affect the health or do injury to material property. It is sufficient, in the language of Sir Knight Bruce, if it is 'an inconvenience materially interfering with the ordinary comfort, physically, of human existence, not merely according to elegant and dainty modes and habits of living, but according to plain and sober and simple notions among the English people.' " *Cleveland* v. *Citizens Gas Light Co., 20 N. J. Eq. (5 C. E. Gr.) 205 (Chancellor Zabriskie, 1869)* ; *Meigs* v. *Lister, 23 N. J. Eq. (8 C. E. Gr.)* (at *p. 204*) *(Chancellor Zabriskie, 1872).*

It has been observed that where witnesses are alleged to be of other than normal condition of mind and body it must appear by the proofs that they are such, as the presumption, in the absence of proof, is that all citizens enjoy a normal condition of mind and body. *Board of Health* v. *Lederer, 52 N. J. Eq. (7 Dick.)* (at *p. 678*) *(Vice-Chancellor Bird, 1894).*

Confining the investigation solely to the witnesses who dwelt in the vicinity and who were therefore subject to annoyance at night, there were produced by the complainant five witnesses, including the four members of his own family, who dwelt upon the Market street side of the block and who were each seriously affected by the noises and vibrations at night and were kept awake thereby. The defendant produced nine witnesses from the Market street front of the block who testified that they were

not annoyed or disturbed by the night operations. From the Second street side of the block the complainant and defendant each produced two witnesses, those for the complainant testifying that they were seriously annoyed and kept awake, those for the defendant testifying that they were not. Three witnesses were produced by the complainant who dwelt in adjoining blocks and who testified to the annoyances occasioned to them by the noises resulting from the night operation of the plant.

There was nothing in the proofs, or in the appearance of the complainant's witnesses, to show to the court that they were persons having the tastes or the nerves of the fastidious or the over-refined; they each appeared to be persons accustomed to plain, sober and simple existence such as is lived by the average person in an American community. As before pointed out, the complainant and his family described effects produced upon them by the annoyances which I cannot help but believe were largely mental or imaginary. But this does not in any way militate against the proven fact that the annoyances did exist and did keep them from obtaining rest and did render their dwelling practically unfitted as a place for rest; and, as previously said, the charge of over-exaggeration which properly lies against the complainant's family in this respect, does not at all apply to the other witnesses produced by the complainant. each of whom was affected at night so seriously as to disturb his rest. The fact that others, either because they were differently situated with respect to the plant, or differently constituted physically, did not suffer a similar annoyance, does not deprive the complainant of his right to relief. As the court said in *Citizens Gas Light Co.* ads. *Cleveland, 20 N. J. Eq. (5 C. E. Gr.)* (at *p. 205*) (*Chancellor Zabriskie, 1869*) : "The discomforts must be physical, not such as depend upon taste or imagination. But whatever is offensive physically to the senses, and by such offensiveness makes life uncomfortable, is a nuisance; and it is not the less so because there may be persons whose habits and occupations have brought them to endure the same annoyances without discomfort. Other persons or classes of persons whose senses have not been so hardened, and who, by their education and habits of life, retain the sensitiveness of their natural organi-

zation, are entitled to enjoy life and comfort as they are constituted." See, also, *Harrison* v. *St. Mark's Church, 3 W. N. C.* (*Pa.*) *384.*

In view of the authorities and the undisputed facts in this case, it seems to me that the complainant is entitled to have this plant restrained from operating after a reasonable hour at .night and until a reasonable hour in the morning. He has suggested that the restraint should be from ten P. M. until five A. M.; I will, however, settle the hours upon the settling of the decree, which may be done upon notice.

I will advise a decree in accordance with the above views.