RALPH SANS AND MITZI SANS, PLAINTIFFS-RESPONDENTS, v. RAMSEY GOLF AND COUNTRY CLUB, INC., DEFENDANT-APPELLANT.

Argued February 3, 1959—Decided March 17, 1959.

*Mr. Walter D. Van Riper* argued the cause for plaintiffs-respondents (*Messrs. Van Riper & Belmont,* attorneys).

*Mr. James A. Major* argued the cause for defendant-appellant (*Mr. James M. Muth,* on the brief).

The opinion of the court was delivered by

FRANCIS, J. An injunction was issued by the Chancery Division of the Superior Court against defendant Ramsey Golf and Country Club, Inc., barring the further use of the men's and women's third tees of its golf course. The Appellate Division affirmed, 50 *N. J. Super.* 127 (1958), and this Court granted certification.

The issue presented is a novel one. The facts which created it are not seriously in dispute. The physical setting which forms its background is the product of the ingenuity of a real estate developer.

In the 1940's the National House and Farms Ass'n, Inc., undertook a combination residential and country club development in the boroughs of Ramsey and Allendale, Bergen County. A nine-hole golf course was laid out, surrounded on all sides by home building lots. Only eight greens were provided, but the holes were so arranged that one green was to be played twice. The development tract contained

three small lakes, one of which, called Mirror Lake, became the water hazard hole about which this controversy centers. A club house and tennis courts were constructed. National organized the defendant Ramsey Golf and Country Club, Inc., for the purpose of managing the recreational facilities. Under the sales plan the purchaser of a lot or a home automatically qualified for membership in the club. In 1945, after an undisclosed number of lots had been sold, the golf course, the clubhouse and the recreational areas were conveyed to defendant. Apparently at a later time in some manner associate memberships were authorized. They were not dependent upon ownership of a lot or home in the development.

In 1949 the plaintiffs, husband and wife, purchased a lot in the development. Naturally, they were aware of the existence of the golf course, and they became members of the club. They commenced construction of a home on the lot in 1950, after which they acquired two adjoining parcels. One side of their property adjoins the fairway of the second hole. The rear line of the three lots is near Mirror Lake but does not run to the .water. It is separated from the edge of the lake by a strip of land varying in width from 11 to 40 feet, which is owned by the golf club.

In 1948 the present third women's tee was built. Its location was designed to create a short par 4 water hole. A successful drive required a carry over the water at a point about 25 yards from the northerly edge of the lake. It seems clear, as the Appellate Division found, that the tee had been in continuous use since its installation, although the plaintiff Ralph Sans testified that he did not notice it until 1950 when his home was being built. Subsequently, apparently in 1949, a separate men's tee was built for this hole about 30 feet farther from the northerly edge of the lake. The purpose was to lengthen the water hazard for the men. Both tees are on golf club property. According to Sans, the men's tee is "roughly" 50 to 60 feet from the southerly corner of the rear of his house; the women's tee is closer.

In order to reach the third tees from the second green, the golfers walk along the 11-to 40-foot-wide path (owned by defendant and described above) separating plaintiffs' rear lawn from the lake.

Plaintiffs moved into their new home in June or July of 1951, and have lived there since that time. They have two children, who were 10 and 11 years of age when the case was heard. As the membership of the club grew, play on the golf course increased, and the players' use of the third tees and the path to reach them became annoying and burdensome to plaintiffs. They began to complain to defendant's officials, and thereafter and until this suit was brought, they sought to effect the relocation of the tees to the north of the northerly line of the lake. Such a change is feasible. In fact, when a stay of the restraint issued by the trial court was denied, a new temporary tee was built and has been in use pending the determination of this appeal. The objection of defendant to adopting it permanently is that an attractive short par 4 water hole is transformed into an ordinary par 3 one on a nine-hole course which already has three par 3 holes.

Plaintiffs' complaint charged defendant and its members with trespassing on their land by using the pathway along the lake in walking to the ladies' and men's tees in question. This contention was abandoned when it appeared that plaintiffs did not own the strip and that, although National had not conveyed it to defendant in the original 1945 deed, a transfer had been made by deed in 1955. Other allegations, however, in company with the issues appearing in the pretrial order, were deemed by the trial court to present a claim that the location of the tees and the manner and incidents of their use by defendant and its members constituted a private nuisance as to plaintiffs. The trial was conducted on the latter basis.

Proof was adduced that in the golf season play begins on the third tees as early as 6 A. M. and continues throughout the day until twilight. On week-ends and holidays the activity is more intense. Sans spoke of an "endless stream of golfers" using the path just in back of his house. He

estimated that about 500 families held membership in the club. The person who had been defendant's president in 1954 and 1956 testified and was asked the number of resident members. He said that he had no idea and would have to refer to the records. They were never produced. Later, after the noon recess, he returned to the stand and said, in answer to counsel for defendant: "I am not sure whether it is 299 or 305 resident families in the Estates." When he joined the club in 1950 there were "somewhere around 120 or 125 families." In 1957, he said, 69 associate members (*i. e.*, those who do not live in the development) had been admitted; there were 75 such members in 1954 and 1956, and 90 in 1955. He conceded that play on the course had increased since 1950. Yet he claimed that in the summertime on week-ends "we would run an average—not having counted them, I would have to guess—80 to 110 or 115" players. The assertion may be contrasted with the testimony of the 1948 chairman of the greens committee who fixed the number of resident male golfers in that year at "perhaps" 50, and the associate members at between 40 and 50, with about 100 members playing the course on week-ends. This witness sold his property in 1949 and thereafter had no connection with the club.

The unusual feature of this testimony is that in 1948, with many times fewer families and about four- or five-ninths as many associate members, there were about the same number of players on week-ends as in 1955. The reliability of such proof in the face of Sans' testimony of a steady stream of golfers all day long, is open to serious question. If the defense witness estimate of 115 players is accepted and the assumption made that each golfer plays 18 holes on this short course on Saturdays, Sundays and holidays, there were 460 trips each day over the path in back of plaintiffs' home to the third tee and back to the fairway after driving across the lake. And every 18-hole player added to defendant's apparently low figure means four additional passages over that path. The absence of proof as to the exact number of week-end players in the

years between 1950 and 1955 cannot obscure the fact that a substantial increase in play occurred during that period. The intensified use brings into focus another factor. The original map of the Ramsey Country Club Estates, approved in 1940 by the Borough of Ramsey and filed in 1941 in the Bergen County Clerk's Office, was marked in evidence. It shows the layout of the golf course virtually encircled by demarcated building lots. As portrayed then, Mirror Lake was not a water hole. There was no tee anywhere on the westerly or northerly side thereof, and, of course, none in the vicinity of the lots now owned by plaintiffs. The nearest tee to those lots seems to have been approximately 250 feet to the southeast of the water, *i. e.*, across the lake and to the southwest. What is now the ladies' third tee was built personally by some members of the club in 1948 for the use of both men and women. The then chairman of the greens committee testified:

"Q. Who else did you say worked with you in laying out that tee?
A. Well, back in those days there were a group of regulars. Do you want names?
Q. Yes.
A. I recall Bill Millett, Bob Foyles. Both were then residents of the Ramsey Golf and Country Club. Myself. Then I had occasional help from others now and then. I cannot recall. Walter Yonker would lend a hand now and then, but like every organization a few seemed to carry the burden, and we personally built this tee, carried the dirt, and we used fill that was trucked in for this second green. I personally brought several wheelbarrows in to level off the spot which is shown here at the ladies' tee. We built that up."

In 1948 there were no houses in the area; "nothing there but just the woods." Thereafter, the additional tee was constructed in the location described in order to make the water carry longer for the men.

When Sans bought his first lot in 1949, the one on which his home was later constructed, he did not see the tee or tees in question. And there is no proof that anyone called them to his attention. It does appear that a certain brochure respecting the development had been given to him. A similar

one was introduced in evidence. It contained what appeared to be an aerial color view of the tract, including the golf course. Although the tees were indicated, none was depicted on plaintiffs' side of the lake. When an inquiry was made on cross-examination as to whether he did not know that he was "buying a piece of property immediately adjacent to the golf course," he answered: "No, we did not buy a piece adjacent to the golf course. We had a choice of three lots on that end and we bought the lot away from the golf course." And as has been indicated, he testified further that he did not see a tee in the rear of his lots until some time in 1950 when his home was being erected.

According to plaintiffs, the constant movement of the players to and from the tee in close proximity to their rear lawn and house was accompanied by a flow of conversation which became annoying and burdensome to them. It awakened them and their children as early as 7 in the morning and it pervaded their home all day long until twilight. Moreover, they have a consciousness that everything they say in or around the house can be heard out on the path and so they are "under a constant strain and constant tension." They "never feel relaxed or free at home"; "[w]e never know when there is someone in our back yard." Occasionally, a low hook or slice or heeled shot of a golfer carries upon their lawn. Then, by means of a trespass, the ball is retrieved. Sometimes it is played from that position. Apparently there are no out-of-bounds stakes in the area. The combination of difficulties makes it impossible to sit outside and "enjoy supper."

At times there are as many as 12 persons waiting to use the ladies' and men's tees. On a short course containing three par 3 holes, such backing up of playing groups, particularly at a 260-yard water hole, might well be expected. This gathering adds to the conversation, and the voices can be heard in the house. While silence is the conventional courtesy when a golfer is addressing his ball and swinging, the ban is relaxed between shots, and presumably the nature

of the comments depends in some measure upon the success or failure of the player in negotiating the hazardous water.

But an even more serious objection involves plaintiffs' children. They have no freedom of play on their back lawn. Golfers tell them not to play there and constantly admonish them to be quiet. If they move their activities to the north side of the property, they are endangered by balls being driven on the second fairway. This exposure has constantly worried Mrs. Sans. The children have a dog. On one occasion they were cavorting in the rear of the house and the dog was barking. A golfer instructed them to keep it quiet, and when they were unable to do so he walked on plaintiffs' property and knocked the animal unconscious with a club—even though one of the children pleaded with him not to do it. Complaint about the incident to one of defendant's officials met with the response that "The dog had no right to be there." At times the players allow their own dogs to accompany them around the course, and they have attacked plaintiffs' dog when it was on the rear lawn.

The resident members of the club have the common right to use the lakes for fishing and boating. Plaintiffs have an aluminum boat in the lake immediately to the rear of their house. If the children take the boat out, the golfers at these tees order them off the water. They cannot fish with safety from the banks to the rear of the house for the same reason, and because of the danger of being struck by golf balls. Even in the winter, when children were ice skating there, golfers were hitting balls over their heads to the third fairway. Mrs. Sans, whose health was so affected by the strain that medical aid was required, testified: "[I]t is a beautiful lake for ice skating. Children ice skate there. I called up almost hysterical this winter [one of the defendant's directors]. [The players] were driving right over the children's heads. And they would say, 'Move down.' Children don't know what area, how far they can move down. They really trust those golf balls. They haven't the fear I have of them. I have complained several times about that." And she said, also speaking of the children:

"I had to keep after them, and they [the golfers] kept after them. And all of the time the children had to be quiet; they could not make much noise. I thought a lot of children would come over and play with my children, but I found out that it was an unsafe place and the mothers did not want their children to come over and play because it was not safe. I felt funny about inviting friends over to play with my children. The playmates they had before [moving to this place], their mothers wouldn't bring them up. If they did, they had to stay with them every minute. It was very, very dangerous. The golfers kept pushing them off, telling them, 'Keep quiet. Don't make noise.' "

Defendant recognized the danger, and at times during the winter the tee was closed off to avoid possible injury to the skaters. When this happened the hole was played from the other side of the lake—presumably in a manner similar to that followed since the injunction in this case.

On the basis of the evidence, which stands without substantial dispute, plaintiffs claim that the third tees in their present location constitute a private nuisance and that their use should be enjoined. Defendant denies that the facts in their total impact warrant that conclusion. Further, it claims that plaintiffs bought their lots, built their home and moved into the area with full knowledge of the existence and use of the golf course and therefore assumed any annoyances and inconveniences incident to the playing of the game.

The circumstances here are unique. A situation where a person buys or builds a home adjoining a wholly independent, unrelated and existing conventional type golf course is quite dissimilar. The basic theme of this development was residence. The recreational facilities, including the golf course were subordinate. Their purpose and existence were to make the area a desirable one in which to dwell. Note the ecstatic exclamations of the developer's brochures:

"The perfect home location; * * * a millionaire's paradise for moderate income families; * * * Ramsey Country Club Estates is the culmination of a ten year search for the perfect home location * * *. Each approved purchaser will automatically receive a share representing proportionate ownership in the Country Club and all its properties. The Club will own the impressive

$100,000 ivy covered stone mansion for its club house. Here will be the center of social life for this unusual new community * * *. Owner-members of the Ramsey Country Club will own for their *exclusive use* the new 9-hole golf course * * * (the record contains no explanation of how the associate members—non-owners of property in the development—happened to be admitted to the club. Sans understood that membership was to be limited to property owners.), spacious sand bathing beaches, three picturesque lakes for canoeing, boating and fishing * * * complete facilities for the enjoyment of all winter sports * * *. Residents will enjoy swimming, canoeing, fishing, ice-skating in the comfort and safety of their own private community. * * * This magnificent club house and its grounds—all of these wonderful recreational facilities—will be shared, owned and enjoyed by a selected group of families who will live luxuriously in these unusual and incomparable surroundings for less than the cost of a small city apartment." (Emphasis added, insertion ours.)

The plaintiffs may justly assert that these comments add equitable strength to their position in the present controversy. The brochure given to them before they became purchasers in 1949 portrayed the layout of the course; the greens were numbered and the tees were indicated. As has been pointed out, no tee appeared on their side of Mirror Lake. No suggestion is made that any representative of the developer or of defendant apprised them of any such tee. And it is not shown on the detailed map on file in the county clerk's office. In the factual context, the element of reliance by the Sans cannot be overlooked.

Thus the heart of the project was and is the home. The pastime facilities were intended to be no more than an aid to the enjoyment of the home, as the veins facilitate the functions of the heart. An avoidable and readily curable ailment in one vein should not be permitted to impair the central organ. Especially is this true when the remedy calls for a comparatively simple adjustment which will not materially impair the physical structure in its entirety.

 The essence of a private nuisance is an unreasonable interference with the use and enjoyment of land. The elements are myriad. The law has never undertaken to define all of the possible sources of annoyance and discomfort which would justify such a finding. *Pollock, Torts* (1887),

260, 261. Litigation of this type usually deals with the conflicting interests of property owners and the question of the reasonableness of the defendant's mode of use of his land. The process of adjudication requires recognition of the reciprocal right of each owner to reasonable use, and a balancing of the conflicting interests. The utility of the defendant's conduct must be weighed against the *quantum* of harm to the plaintiff. The question is not simply whether a person is annoyed or disturbed, but whether the annoyance or disturbance arises from an unreasonable use of the neighbor's land or operation of his business. *Prosser, Torts* (*2d ed.* 1955), 410. As the Court of Appeals of Ohio put it in *Antonik v. Chamberlain,* 81 *Ohio App.* 465, 78 *N. E.* 2d 752, 759 (1947):

> "The law of nuisance plys between two antithetical extremes: The principle that every person is entitled to use his property for any purpose that he sees fit, and the opposing principle that everyone is bound to use his property in such a manner as not to injure the property or rights of his neighbor."

Defendant's members have the right to the ordinary and expected use of the golf course. Plaintiffs have the correlative right to the enjoyment of their property. The element of reciprocity must be emphasized because the parties' interests stem from a common source and are more mutually interdependent than in the usual case. The Appellate Division properly suggests the pertinent inquiry to be "whether defendant's activities materially and unreasonably interfere with plaintiffs' comforts or existence, 'not according to exceptionally refined, uncommon or luxurious habits of living, but according to the simple tastes and unaffected notions generally prevailing among plain people'." 50 *N. J. Super.* 127, at *page* 134, citing *Stevens v. Rockport Granite Co.,* 216 *Mass.* 486, 104 *N. E.* 371 (*Sup. Jud. Ct.* 1914).

In the unusual circumstances of this case, the activities of defendant are manifestly incompatible with the ordinary and expected comfortable life in plaintiffs' home and the normal use of their property. The evaluation of the con-

flicting equities must be made in the factual framework presented. And any relief granted must result from a reasonable accommodation of those equities to each other in the light of the evaluation. In our judgment, the facts considered in their totality demonstrate that plaintiffs' interests are paramount and demand reasonable protection. See *Benton v. Kernan,* 130 *N. J. Eq.* 193 (*E. & A.* 1941). The trial court and the Appellate Division felt that a proper balance of equitable convenience could be achieved by requiring defendant to relocate the ladies' and men's third tees. Such relief, in our opinion, does not represent a burden disproportionate to the travail which would be suffered by plaintiffs and their family through the perpetuation of the present method of play on the course.

Judgment affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices HEHER, BURLING, JACOBS, FRANCIS and PROCTOR—6.

*For reversal*—None.