162 N.J. Super. 248 (1978)
392 A.2d 652
JOHN F. MALHAME AND LESLIE MALHAME, H/W, WILLIAM PECORARO AND JUDITH PECORARO, H/W AND ARNOLD ZIMMERMAN AND CATHERINE ZIMMERMAN, H/W, PLAINTIFFS,
v.
BOROUGH OF DEMAREST, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided August 3, 1978.
*251 Mr. Antranig Aslanian, Jr. for plaintiff.
Mr. M. Robert De Cotiis for defendant Borough of Demarest (Messrs. Andora, Palmisano, DeCotiis, and Harris, attorneys).
O'HALLORAN, J.D.C. (temporarily assigned).
This action is brought by John and Leslie Malhame, William and Judith Pecoraro, and Arnold and Catherine Zimmerman, all residents of the Borough of Demarest in Bergen County, seeking a judgment enjoining the borough from continuing to use the present fire alarm siren system and directing defendant borough to inaugurate a different fire alarm system, on the ground that the present system is a nuisance. The borough denies the existence of an actionable nuisance and raises other defenses which will be considered herein.
The Borough of Demarest is substantially a residential community with an area of 2 1/2 square miles, a population of about 6,000 people and with about 1,500 structures. The present fire alarm system consists of three five-horsepower sirens erected in 1953 and unchanged since that time. One siren is located on the firehouse in the center of town, the area where the few commercial establishments are located. The second siren is on the west side of town on Hardenburgh Avenue, and the third is on the east side on Anderson Avenue. The sirens are tested six days a week (Sunday excluded) at noon. The sirens are activated by pressing the test lever at police headquarters. There is an automatic timer that turns the sirens off after ten seconds. Since there is no one regularly on duty in the police station on weekends, the Saturday test is activated from the Closter police station. The Saturday test also serves as the civil defense alarm test, and lasts somewhat longer than ten seconds. *252 The sirens are activated for a fire by pressing a separate emergency lever at police headquarters for which there is an automatic timer turning the sirens off after two minutes. In 1977 the sirens were sounded 76 times for fires. Problems have been experienced in the past with a device in a local public high school which automatically activates the sirens. Malfunctions have caused the device to set off the sirens. Since there is no timer, the sirens have to be turned off at police headquarters. This has resulted in the sirens blaring for as long as 20 minutes on a weekend before a police officer could turn them off. Testimony indicated that this situation is to be relieved by the addition of a timing device at the high school which will deactivate the sirens.
The loudness of the sirens is measured in "DBA", or decibels on the "A" scale. Apparently "decibels" is a relative term and is meaningless by itself, but takes on relative meaning when placed on an "A", "B", etc., scale. The intensity of the sound of the sirens in this case was measured in DBA.
The west-side siren is located on a utility pole in front of 48 Hardenburgh Avenue, the home of plaintiffs William and Judith Pecoraro, who have lived there since 1969. They have three children, ages 10, 7, and 3. Dr. Pecoraro is a dentist with his office at the same address. The siren is located ten feet from the property line and 35 feet from the house. Dr. Pecoraro was a councilman from January 1, 1975 through December 31, 1977. (During part of that term he serves as fire commissioner and liaison to the board of health.) He has complained about the siren numerous times, formally and informally, since shortly after moving to the premises.
There was no medical evidence offered to show any hearing impairment sustained by plaintiffs, their families or another nonparty resident who testified about the effects of the siren, and the court finds no such impairment. Nor were any of these people ever treated or examined by a doctor in connection with the complained of effect of the sirens. However, *253 the sounding of the sirens (at least the two-minute cycle for emergencies) does cause Dr. and Mrs. Pecoraro and their children to have temporary ear pain, lasting even after the sirens stop. It causes an apprehensive, jittery, shakey feeling. It causes the children to be frightened. Sleep is interrupted. When the siren sounds at night the parents must get up and go to the children. If the children are outside when the siren sounds during the day, they are brought in. Normal activities, such as conversation and listening to TV are temporarily disrupted. Babysitters and other temporary workers have to be warned about the siren. Patients at Dr. Pecoraro's dental office on the premises have become upset and complained of pain.
Dr. Joseph Danto, with a Ph.D. in audiology, measured the siren's sound levels at the Pecoraro home in 1975. The maximum reading on the front lawn was 128 DBA and the maximum reading in the bedroom of one of the children was 113 DBA. For comparison, the noise level of a pneumatic drill at three feet is about 100 DBA; a jet taking off at a distance of 500 feet is about 120 DBA; a vacuum cleaner about 80 DBA. 120 DBA is the threshold for physical sensation, and pain is experienced at between 130 and 140 DBA.
Plaintiffs Zimmerman live next door to the Pecoraros. Mrs. Zimmerman was in the hospital and could not appear at trial. It was stipulated that Mr. Zimmerman's testimony would be cumulative to that of the Pecoraros.
Plaintiff John Malhame has lived at 66 Edward Street with his wife for five years. They have three children, ages 8 and 2 1/2 years, and 8 months, respectively. The east-side siren is located ten feet from his property line and about 50 feet from the house. The sounding of the siren causes him and his family to be extremely upset and nervous. If outside when it sounds, the noise is deafening and causes his ears to ring. If the siren sounds during sleeping hours, he is awakened for two hours or more and, as in the case *254 of the Pecoraros, the parents must go to the younger children.
Dorothy Veasey (not a plaintiff) has resided at 23 Anderson Avenue for 30 years. The east-side siren was relocated across the street from and about 140 feet south of her home in 1953. The sounding of the siren has caused her anxiety, with faster heartbeat and shaking hands. If outside when it sounds, it hurts her ears and she must go in. On occasion when the siren has sounded longer than usual, she has gotten in her car and driven off to escape the noise. Once, 15 years ago, when it sounded out of control for over 20 minutes, she ran into the street screaming. She has lost many hours of sleep.
As noted above, the present fire alarm siren system was installed in 1953. A review of minutes of mayor and council meetings indicates that there were complaints about the west-side siren as early as 1954. In 1973 plaintiffs William Pecoraro and John Malhame presented at a mayor and council meeting a petition signed by 30 residents urging that the sirens violated the Noise Control Act of 1971. Later that year the council authorized the volunteer fire department to have an accoustical survey made to evaluate the system. On October 16, 1973 a resolution was passed by the Demarest Environmental Commission suggesting that the mayor and council investigate the possibility of locating the west-side siren in an unpopulated area or of having the sound baffled or lowered because of its high decibel level. Under date of November 5, 1973 the Bergen County Health Department advised the mayor of the following noise level recordings at the source areas:
(a) firehouse siren  110 DBA for three seconds peak level;
(b) west-side siren  125 DBA for three seconds peak level and 84 DBA for 15 seconds continuous sound;
(c) east-side siren  125 DBA for three seconds peak level.
*255 In 1974 the council adopted a resolution concluding that, after thorough investigation of numerous possibilities, the sirens be maintained at their present locations. It appears from the minutes that the reason for rejection of alternatives was cost.
On June 12, 1975 five residents (including three of the plaintiffs) filed a "formal complaint" in the form of a letter with the Demarest board of health charging the use of the sirens at present noise levels to be a nuisance under the local ordinance. On July 10, 1975 the board of health adopted a resolution finding that the noise levels from the sirens in their present locations represent "a severe nuisance and possible health hazard to the residents of Demarest living in close proximity, * * *" and recommending to the mayor and council that they take immediate steps to alleviate the situation. On December 11, 1975 the then borough sanitarian filed a memo with the board of health indicating that he felt that the noise level of the siren system was a serious health nuisance that must be abated. Finally, on December 31, 1975, pursuant to a resolution adopted at an earlier meeting, the board of Health directed a memo to the mayor and council stating that because of the noise level of the sirens the borough continues to be in violation of the local ordinance and requesting that effective measures be taken by May 1, 1976, for abatement of the nuisance. The board supplemented this resolution with a further resolution adopted at its meeting of September 22, 1976, determining that sound from the fire sirens at a volume exceeding 100 DBA at any property line constitutes a nuisance and recommending that the mayor and council abate this nuisance by June 1, 1977.
Under date of September 1, 1976 the fire chief had directed that the sirens and plectron system (home radios) be used for all fires and emergencies, day or night, but that for non-fire related calls, only the plectron system would be used.
On May 2, 1977 the council adopted a resolution to:
(a) retain the present fire siren alerting system;
*256 (b) obtain specifications for instituting silent testing of the sirens;
(c) purchase 20-23 minitors (beepers carried by volunteer firemen);
(d) consult with the fire department regarding the use of sirens for structural fires and emergencies only;
(e) explore the lowering of the number of cycles that the fire siren will sound.
When advised of this resolution the board of health responded that it did not comply with its earlier directive, but then simply requested that the mayor and council keep the board advised of its progress and settle the problem by January 1978. Because of objections from the firemen the mayor vetoed the purchase of minitors, and apparently no further action was taken on silent testing. (A councilman testified at trial that verbal reports indicated the system could not be tested silently; the fire department wanted the siren for all fires, and the emergency cycle had been lowered to two minutes.)
In June 1978 units emitting a humming sound were tested at the three present siren locations. Although a formal report had not yet been submitted at the time of trial, it appears that these devices (at least limited to those three locations) are inadequate to give sufficient sound throughout the community to alert the volunteer firemen. No further action has been taken by the borough.
In 1976 the board of health, with the authorization of the mayor and council, had engaged Noise Unlimited, Inc., an acoustical testing and consulting firm, to conduct a survey and make recommendations with regard to the fire siren system. Noise Unlimited conducted such a survey by taking readings throughout the community with noise meters and then plotting the results on a map of the borough. It submitted a report of August 23, 1976, and a supplemental report of September 20, 1976, to the board of health, and a further report of December 14, 1976, directly to the mayor and council.
*257 Noise Unlimited concluded that outlying areas of the borough (about 20% of the borough) had insufficient siren sound level (less than 70 DBA) because only three sirens with insufficient sound power are used, and partly because of the locations of the west-side and east-side sirens. Noise Unlimited further concluded that many homes are exposed to unnecessarily excessive siren sound levels (in excess of 100 DBA) due to the proximity of the west-side and east-side sirens to these homes. To increase the sound levels along the outskirts of the borough and to eliminate the excessive sound levels at many homes, Noise Unlimited recommended the retention of the existing five-horsepower siren on the firehouse and the installation of two two-horsepower sirens on the west side and two two-horsepower sirens on the east side of the Borough.
Three of these sirens were to be on vacant land (none closer than 500 feet to any home) at two Green Acres tracts and a nature center, and the fourth at a grammar school.

I. Preemption

Defendant borough contends that any action sought to be taken by the board of health in this matter was invalid because the matter of noise control has been preempted by the State.
N.J.S.A. 13:1G-1 et seq., the Noise Control Act of 1971, authorizes the State Department of Environmental Protection to adopt noise standards embodied in regulations in order to insure the people "an environment free from noise which unnecessarily degrades the quality of life; * * *" N.J.S.A. 13:1G-2. Pursuant to this authority the Department has adopted chapter 29 of Title 7 of the New Jersey Administrative Code, entitled "Noise Control." N.J.A.C. 7:29-1.3 deals with stationary emergency signaling devices. The regulation permits testing of these devices once each day between 8 A.M. and 8 P.M. for a minimum cycle, not to exceed ten seconds. (This time limit does not apply to a *258 test during which the personnel actually respond. One such test may be conducted each month.) Such devices may be used only for such testing and for emergency purposes where personnel and equipment are mobilized. The regulation does not include any standard or prohibition with regard to the volume (DBA) of the sound emitted by these devices or their location.
Since the Department of Environmental Protection has not adopted regulations specifying or limiting the volume of sound to be emitted by fire sirens or their location, the State has not preempted the area of plaintiffs' specific complaints in this case and the board of health was not precluded from declaring by resolution that a noise level in excess of 100 DBA at any property line constituted a nuisance.
Moreover, this action is brought by plaintiffs demanding the abatement of a common law nuisance and N.J.S.A. 13:1G-21 of the Noise Control Act of 1971 specifically provides in part that:
No existing civil or criminal remedy now or hereafter available to any person shall be superseded by this act or any code, rules, regulations or orders promulgated pursuant thereto.
The doctrine of preemption is not a defense to this action, nor did it prevent the board of health from making its declaration.

II. Actionable nuisance
The basic issues in this case are whether the maintenance of the fire alarm sirens at their present sound volume and locations constitutes a nuisance, and, if so, whether that nuisance is actionable, bearing in mind the borough's duty to protect the public from fire and other emergency through the use of an effective fire alarm system for alerting the members of its volunteer fire department.
*259 Defendant is not immune from an injunction directing it to abate a nuisance simply because of its status as a municipal corporation.
A municipal corporation no more than any individual or private corporation can maintain or cause a nuisance, and the same remedies exist, generally speaking, against a nuisance arising from municipal action as in other cases. * * * [6 McQuillan, Municipal Corporations, § 24.62 at 611]
Defendant argues that if the present use of the fire sirens is a nuisance at all, it is a public nuisance, that is, a nuisance which effects rights enjoyed by all citizens as members of the public, and that this action is not maintainable by plaintiffs as individuals because an individual cannot maintain a suit to restrain a nuisance which injures him only in the rights enjoyed by him as one of the public, citing Poulos v. Dover Boiler & Plate Fabricators, 5 N.J. 580 (1950). Poulos, however, notes an exception to this rule where the individual is able to show a special injury to his interests. In Poulos, defendant closed an alleged right of way over its lands used by plaintiff. While this resulted in more inconvenience to plaintiff than to other members of the public, plaintiff was unable to show any injury to a legal right he had in his own lands. But in Gilmour v. Green Village Fire Dep't, 2 N.J. Super. 393 (Ch. Div. 1949), the playing of more than three night baseball games a week, and the use of arc lights after certain hours, across the street from plaintiff's house, was enjoined. It was noted in the decision that an individual may enjoin a public nuisance where it is shown that he has suffered some private, direct and material damage beyond the public at large, and that the damage suffered is otherwise irreparable.
Here the excessive sound of the fire sirens invades plaintiff's lands and causes physical and emotional injury to them and members of their families. It is not simply a matter of degree of annoyance in comparison to other *260 residents; in the court's opinion plaintiffs are suffering a special injury and may maintain this action.
Moreover, a nuisance may be a public and a private one at the same time. Cresskill v. Dumont, 28 N.J. Super. 26, 38 (Law Div. 1953), aff'd 15 N.J. 238 (1954). The essence of a private nuisance is an unreasonable interference with the use and enjoyment of land. Sans v. Ramsey Golf & Country Club, 29 N.J. 438 (1959). In Sans defendant had to relocate the tee for its third golf hole because its continued use of the tee as then located was enjoined as an extreme annoyance to the neighboring home owner. The court noted that the utility of defendant's conduct must be weighed against the quantum of harm to plaintiff, the question being not simply whether plaintiff is annoyed or disturbed, but whether that annoyance or disturbance arises from an unreasonable use of the neighbor's land or operation of its business. In the case at bar plaintiffs' harm arises from what would be an unreasonable use of the fire siren system if there is available an alternate system which can be operated with the same efficiency but without the complained of harm.
Therefore, if the use of the present fire alarm system constitutes a nuisance, this action is maintainable by plaintiffs either because the nuisance is a private one, or because it is a public nuisance with special injury to them.
Does the use of the sirens at their present sound volume and locations constitute a nuisance?
The Noise Control Act of 1971 defines noise as meaning "any sounds of such level and duration as to be or tend to be injurious to human health or welfare, or which would unreasonably interfere with the enjoyment of life or property * * *" N.J.S.A. 13:1G-3(d). An excellent test for determining whether specific noise amounts to a nuisance is referred to in State v. Holland, 132 N.J. Super. 17 (App. Div. 1975), which upheld the constitutionality of a noise ordinance and in so doing examined the historical definition *261 of a common law nuisance with respect to noise. The court said:
From the beginning our cases dealing with nuisances based upon noise have held that the matter is a relative one, requiring the weighing of the competing interests and rights of the parties in each case, and that to constitute a nuisance and a disturbance of the peace a noise must be an unreasonable one in the circumstances or cause material annoyance. The leading case, and the one most often cited, is Benton v. Kernan, 130 N.J. Eq. 193 (E. & A. 1941) which laid down the test that "A noise may constitute an actionable nuisance * * * but it must be a noise which affects injuriously the health or comfort of ordinary people in the vicinity to an unreasonable extent", and it "* * * becomes actionable only when it passes the limits of reasonable adjustment to the conditions of the locality and of the needs of the maker to the needs of the listener" (at 198). [at 25, citations omitted]
Therefore, in determining whether a specific source of noise constitutes a nuisance, there are two elements which must be established: (1) injury to the health or comfort of ordinary people to an unreasonable extent, and (2) unreasonableness under all the circumstances, particularly after balancing the needs of the maker to the needs of the listeners.
A. As to the first element, the court finds that the siren noise level at plaintiffs' homes (and those similarly situated) is more than mere annoyance, but is causing real (albeit transitory) injury to the health and comfort of those residents to an unreasonable extent. The interruption of normal conversation, the drowning out of TV sound, an occasional disturbance during sleeping hours, and like complaints, may all fall within the area of mere annoyance. This type of complaint can be caused by many of the annoying sounds that present-day society forces upon us, such as the passing jet plane which interrupts court-room testimony, or the police car siren wailing in the night. The nature of a fire siren sound is annoying because its very purpose is to disturb, not only to cause the volunteer firemen to report to the firehouse, but to alert the populace to the existence *262 of an emergency that may require use of the streets for speeding equipment (or private cars reporting to the fire station). Depending upon the proximity of the fire sirens, it is also unavoidable that some residents endure more annoyance than others for the good of all. But the court has concluded that because of the extreme closeness of the sirens to them, these plaintiffs are suffering more than mere annoyance, but real harm to their well-being.
There was testimony that Occupation Safety and Health Administration standards will permit noise exposure up to 115 DBA for less than one-half hour a day without ordering changes. (There were various references in the testimony to OSHA but no regulations were ever placed in evidence.) However, OSHA regulations apply to places of work, presumably occupied by adults, for limited periods of time and by choice in return for compensation. Likewise, the situation described by the present and immediate past fire chiefs and the borough clerk and deputy borough clerk are not comparable to the conditions described by plaintiffs. They testified that when they are in the firehouse (directly under the siren) or working at the borough hall (within 100 feet of the siren), the sound does not bother them. However, they each spend only limited amounts of time in proximity to the siren, and then return to their homes. This is not comparable to residents living 50 feet from a siren, not knowing when it will be sounded, day or night.
Counsel have not cited a nuisance case dealing specifically with fire sirens, nor has the court's research revealed one. However, the case of Terhune v. Trustees of Methodist Episcopal Church of Matawan, 87 N.J. Eq. 195 (Ch. 1917) is analogous. There, the court would not restrain the ringing of the church bell for church services, but did restrain the striking of the hours. The bell, which was loud enough to be heard for a distance of from 2 1/2 to 4 1/2 miles, was located only about 50 feet from plaintiff's home. A clock was installed in the steeple and connected with the bell so that it would strike the hours. The hours from 7 A.M. to *263 10 P.M., inclusive, were struck, it taking about 28 seconds to strike the longest hour. Plaintiff, his family and some of the neighbors complained that the bell was annoying, discomforting, at times startling, would cause conversations to cease, would interfere with sleep and the vibrations would shake the house. The court concluded that the ringing of the bell to strike the hours was causing plaintiff and others positive personal annoyance and discomfort to such a degree as to entitle him to relief from what was clearly a nuisance.
Unlike the typical noise-nuisance case involving a rock quarry or some other like source of a constant din, the church bell in Terhune, like the Demarest fire sirens, was sounded only for a matter of seconds, but because of its proximity the immediate neighbors were caused to voice some of the same complaints as the court has heard in this case. And as the Chancery Court in 1917 found the church bell to be clearly a nuisance for its immediate neighbors, this court concludes that the blaring of a fire siren at sound levels well over 100 DBA within 50 feet of a home, at any hour of the day or night, is causing more than mere annoyance, but causing a small number of residents temporary physical pain and more than usual anxiety and fright (particularly the younger children).
B. This brings us to a consideration of the second element of an actionable nuisance, unreasonableness under all the circumstances, a determination which is based at least in part on a balancing of the needs of the maker of the noise to the needs of the listeners and a weighing of the utility of the defendant's conduct against the quantum of harm to plaintiffs. Immediately it is clear that on this point the Terhune case is distinguishable, because the striking of the hours with a church bell is not a necessary, or even a useful public service, but at most a convenience; whereas, an effective fire alarm system is essential to the public safety. The firemen have rejected a system which would rely solely upon the use of minitors and radios, feeling that the former *264 are mechanically unreliable and the latter are effective only when the fireman is at home. In their discretion, the mayor and council have agreed that the most effective and safest system is the use of fire alarm sirens. In balancing the need of the public to be protected from fire and other tragedy against the injury to plaintiffs from excessive sound, the public need would outweigh the injury and plaintiffs would have to continue to suffer for the common good. It would also be unreasonable and inequitable to transfer a nuisance from plaintiffs to another group of residents, or even to one other resident. However, plaintiffs argue that if an alternate siren system can be devised which continues effective coverage and also does not require excessive sound levels at any residential property line, then it would clearly be unreasonable to continue the present system.
Plaintiffs contend that the Noise Unlimited proposal is one such system. As noted earlier, Noise Unlimited has suggested maintaining the present five-horsepower siren at the firehouse and installing four two-horsepower sirens, three on park property and one at a grammar school. This recommendation does offer more effective sound coverage throughout the community in that the areas now having less than 70 DBA coverage would be reduced so that practically the whole borough would be reached by a siren sound level of 70 DBA or more. It appears, therefore, that the Noise Unlimited plan could be implemented without any detriment to public safety.
However, the court is not satisfied that adoption of this proposal would not simply transfer a nuisance to other residents. In arriving at its recommendations, Noise Unlimited selected 100 DBA as the noise level not to be exceeded at any residential property line. 100 DBA was simply an arbitrary compromise chosen in an effort to maintain effective sound coverage without excessive noise at any home. It does not mean that residents near the proposed siren locations with sound levels of, for example, 95 or 98 DBA would not be subjected to substantially the same injurious consequences *265 complained of by plaintiffs  bearing in mind that, although the court did not accept plaintiffs' expert's opinion on this point, he did say that noise levels in excess of 75 DBA could be considered unsafe. According to Noise Unlimited's final report (December 14, 1976), the present system subjects 76 lots to a sound level of 90 to 99 DBA and the proposed plan would subject only 49 lots to such a level; but at least some of the 49 lots would be lots which have sound levels less than 90 DBA now. It should be noted that in its resolution the board of health also chose 100 DBA as the sound level above which a nuisance would exist. However, there is no basis in the board's minutes for the selection of this figure, the board probably having adopted Noise Unlimited's arbitrary compromise.
Even assuming that 100 DBA at any home is a reasonable dividing line between noise which is merely annoying and sound that is so excessive as to constitute a nuisance, the Noise Unlimited proposal still raises some question as to whether its adoption would transfer a nuisance from plaintiffs to at least some other residents. In his testimony at trial, G. Dean McAdoo, president of Noise Unlimited, said that in his opinion 100 DBA would not be exceeded at any property line under the suggested plan and that the borough could be adequately covered without exceeding 100 DBA at any house. However, he also characterized the plan as looking "good on paper." Without actual audible testing of the sirens at the proposed sites, no one really knows their effect. Even "on paper" the final report notes that there will still be three lots subjected to a sound level over 100 DBA (and at least two of these three lots are not two of the 37 lots presently subjected to sound levels over 100 DBA). It appears, therefore, that although the Noise Unlimited plan improves coverage and greatly decreases the number of houses subjected to excessive noise, some residents will have to live with such noise levels and they are not included in the group presently suffering. Furthermore, the Noise Unlimited proposal includes the placing of a two-horsepower siren at a *266 grammar school, either on the building or on a separate pole on the school grounds. A two-horsepower siren has a rating of 102 DBA 100 feet from its base, and, therefore, a higher sound level closer to the base. (A five-horsepower siren has a 107 DBA rating at 100 feet.) The fire department insists that this siren should not be disconnected during school hours. One of the principal areas of plaintiffs' complaints centered around the fright and pain endured by their younger children. Presumably, some of the approximately 200 students in this school are of kindergarten and first grade age, and it does not seem equitable to transfer part of the noise problem to them.
Injunction is an extraordinary remedy that should be used sparingly. It has been said that
There is no power, the exercise of which is more delicate, which requires greater caution, deliberation and sound discretion, and which is more dangerous in a doubtful case, than the issuing of an injunction. [Trisolini v. Meltsner, 23 N.J. Super. 204, 208 (App. Div. 1952), and citations therein]
Since plaintiffs did not clearly establish at trial that the nuisance complained of could be abated without transferring the same injurious consequences to some other residents, the court will not enjoin use of the present fire siren alarm system.

III. Municipal discretion
During the past several years the borough has considered the siren problem at length, has discussed alternate proposals and has concluded that the present effective system should be retained. Defendant argues that such a decision is within its discretion and cannot be questioned unless there was an abuse of that discretion.
It is well established that the courts will not interfere with the manner in which the governing body of a municipality exercises its delegated authority in the absence *267 of bad faith, fraud, corruption, manifest oppression or palpable abuse of discretion. Viera v. Parsippany-Troy Hills Tp. 156 N.J. Super. 19, 22 (App. Div. 1977). There is no claim (nor evidence) here of bad faith, fraud, corruption or manifest oppression. However, action which is arbitrary, capricious or patently unreasonable would constitute a palpable abuse of discretion permitting intervention by the court.
If operation of the present fire alarm system at certain sound levels in some locations were an actionable nuisance, then continued maintenance of that nuisance would be patently unreasonable and would constitute a palpable abuse of discretion.

IV. Miscellaneous
Defendant argues that plaintiffs are barred from the equitable relief they seek by laches. As a matter of fact, plaintiffs have not slept on their rights. Plaintiffs Pecoraro and Malhame, since shortly after they became residents of Demarest, have complained about the sirens informally, by formal petition to the mayor and council, and by complaint to the board of health. As a matter of law, the endurance of a nuisance, even for years, does not constitute laches, since every day's continuance is a new nuisance. State v. Sommers Rendering Co., 66 N.J. Super. 334, 342 (App. Div. 1961).
Nor are the statutes of limitations a defense. They apply to actions at law seeking damages for injury to person or property and do not bar the equitable relief of injunction sought here. In any event, the wrong is a continuing one.
The argument that this action was instituted more than 45 days after the May 2, 1977, resolution of the council (which authorized retention of the present fire siren alerting system among other things) in violation of R. 4:69-6(a), misses the main thrust of this action, which is not simply to challenge that resolution, but to enjoin a nuisance.
*268 Finally, plaintiffs' argument that defendant is now estopped from denying the authority of the board of health to declare that siren sound levels over 100 DBA constitute a nuisance because defendant had asked the board for this advice, lacks merit. There can be no estoppel vis-a-vis plaintiffs, because there was no showing of reliance on the part of plaintiffs. The borough is not questioning the authority of the board, although apparently it does not agree with the board's declaration. It should be noted that the board of health never instituted any legal action against the borough to compel abatement of the nuisance as defined by it.
Plaintiffs have shown that use of the Demarest fire alarm sirens at their present sound levels and locations are causing injury to their health and comfort to an unreasonable extent, thus establishing the first element of a nuisance. But the plaintiffs failed to prove the second element, unreasonable under all the circumstances. They failed because of the unique source of the noise, a fire alarm siren system, which is necessary to the public safety. The continued operation of such an alarm system must be considered reasonable, unless effective alternatives exist which would not cause injury. While the alternate proposed by plaintiffs is as effective as the present system, the court is not satisfied that it could be implemented without injurious consequences to others.
Put another way, plaintiffs have proven a "nuisance", but not an actionable nuisance, because it appears that the only way to abate it is to transfer it (perhaps to a diminished degree) to others.
Defendant's counsel will submit an order for judgment of dismissal without prejudice. Plaintiffs should not have to suffer forever. When further investigation or scientific development reveals a siren system which can be installed without detriment to the public safety and without transferring the nuisance to anyone else, the court will be available to afford equitable relief.