187 N.J. Super. 210 (1982)
453 A.2d 1378
JOEL ROSE ET UX., ET ALS., PLAINTIFFS,
v.
JOSEPH CHAIKIN ET UX., DEFENDANTS AND THIRD-PARTY PLAINTIFFS,
v.
KENNETH L. KESLINK, ENERTECH CORPORATION, A CORPORATION OF VERMONT, AND CITY OF BRIGANTINE, A MUNICIPAL CORPORATION OF NEW JERSEY, THIRD-PARTY DEFENDANTS.
Superior Court of New Jersey, Chancery Division Atlantic County.
Decided November 10, 1982.
*213 Stephen R. Nehmad for plaintiffs (Perskie & Nehmad, attorneys).
Marvin Z. Wallen for defendants and third-party plaintiffs (Wallen & Brilliant, attorneys).
*214 Augustine A. Repetto, Jr. for third-party defendant Enertech Corporation.
John R. Armstrong for third-party defendant City of Brigantine (Subin, Armstrong & Armstrong, attorneys).
GIBSON, J.S.C.
This action seeks to enjoin the operation of a privately owned windmill. Plaintiffs occupy neighboring properties and allege that the unit constitutes both a private nuisance and a violation of local zoning laws. Defendants deny the allegations and have counterclaimed. Based on the evidence presented at trial, the following factual findings may be made.
All of the parties are residents and/or owners of single-family homes located in a contiguous residential neighborhood in Brigantine, New Jersey. On or about June 18, 1981 defendants, in an effort to save on electric bills and conserve energy, obtained a building permit for the construction of a windmill. Pursuant to that permit they erected a 60'-high tower on top of which was housed a windmill and motor. The unit is located ten feet from the property line of one of plaintiffs. Shortly after the windmill became operational it began to produce offensive noise levels, as a result of which plaintiffs experienced various forms of stress-related symptoms, together with a general inability to enjoy the peace of their homes.
Relief was initially sought through city council. Although certain orders were issued reducing the times when the windmill could operate, the problem continued more or less until an action was instituted in this court. Following an initial hearing here, there was a preliminary finding of a nuisance and a temporary restraining order was issued restricting the use of the machine except for a period of no more than two hours a day, that being the time claimed to be needed for maintenance purposes. By *215 consent, those restraints were continued up through the time of trial and still continue.[1]
Although the evidence was in sharp dispute concerning the impact of the noise levels existing when the windmill is operational, this court is satisfied that those levels are of such a nature that they would be offensive to people of normal sensibilities and, in fact, have unreasonably interfered with plaintiffs' use and enjoyment of their properties. Measurements at the site reveal that the sound levels produced by the windmill vary, depending on the location, but generally show a range of 56 to 61 decibels (dBA). In all instances those levels exceed the 50 dBA permissible under the controlling city ordinance. Ordinance 11-1981, § 906.6.3, City of Brigantine. Although there are other sources of sounds in the area, for the most part they are natural to the site. These background (or ambient) sounds include the ocean, the sounds of sea gulls, the wind and the distant sounds of occasional boat traffic in the adjacent inlet. An exception to these "natural" sounds is the heat pump owned by plaintiffs Joel and Isadora Rose, of which more will be said later.
The sounds of the windmill have been variously described. Generally, however, they most resemble those produced by a large motor upon which there is superimposed the action of blades cutting through the air. The sounds are distinguishable not just by the level of the noise produced (noise being defined as unwanted sound) but because they are unnatural to the scene and are more or less constant. Although a reduction in the wind speed to below eight m.p.h. will automatically shut down the unit, the prevailing winds at this site are generally above that. Given the proximity of the homes involved, the net result is a noise which is both difficult to ignore and almost impossible to escape.
*216 The impact on plaintiffs is significant. Both the lay and expert testimony support the conclusion that, in varying degrees, all of them experienced tension and stress-related symptoms when the windmill was operational. Those symptoms included nervousness, dizziness, loss of sleep and fatigue. The sounds disturbed many of the activities associated with the normal enjoyment of one's home, including reading, eating, watching television and general relaxation.
Defendants counterclaim and seek to enjoin the operation of the Rose heat pump. Although the unrebutted testimony indicated that it, too, produced sound levels in excess of 50 dBA, the impact on defendants was relatively small. Complaints were limited to some disturbance of certain activities, such as causing a distraction during reading and dinner. There is no evidence that it unreasonably interferes with defendants' health and comfort. What disturbance does occur is limited not only in duration but in frequency. The unit is rarely used by the Roses, and when used is on for relatively short periods of time.

I. Private Nuisance

The basic standards for determining what constitutes a private nuisance were set forth by our Supreme Court in Sans v. Ramsey Golf & Country Club, 29 N.J. 438 (1959). The court made clear that a case-by-case inquiry, balancing competing interests in property, is required.
The essence of a private nuisance is an unreasonable interference with the use and enjoyment of land. The elements are myriad.... The utility of the defendant's conduct must be weighed against the quantum of harm to the plaintiff. The question is not simply whether a person is annoyed or disturbed, but whether the annoyance or disturbance arises from an unreasonable use of the neighbor's land.... [at 448-49]
Unreasonableness is judged
"... `not according to exceptionally refined, uncommon or luxurious habits of living, but according to the simple tastes and unaffected notions generally prevailing among plain people.'" 50 N.J. Super. 127, at page 134, citing Stevens v. Rockport Granite Co., 216 Mass. 486, 104 N.E. 371 (Sup.Jud.Ct. 1914). [at 449]
Defendants resist plaintiffs' claim by advancing three basic arguments: first, that noise, standing alone, cannot constitute a *217 private nuisance; second, that even if noise can amount to a nuisance, the noise from their windmill does not exceed the applicable threshold, and third, that in any event the circumstances of this case do not warrant the "extraordinary relief" of an injunction.
The first argument is without merit. New Jersey case law makes it clear that noise may, under the principles of unreasonable use, constitute an actionable private nuisance. See, e.g., Benton v. Kernan, 130 N.J. Eq. 193, 197-98 (E. & A. 1941); Lieberman v. Saddle River Tp., 37 N.J. Super. 62, 67 (App.Div. 1955); Malhame v. Demarest, 162 N.J. Super. 248, 260-61 (Law Div. 1978); Reilley v. Curley, 75 N.J. Eq. 57, 59-60 (Ch. 1908). Noise is an actionable private nuisance if two elements are present: (1) injury to the health and comfort of ordinary people in the vicinity, and (2) unreasonableness of that injury under all the circumstances. See Malhame v. Demarest, supra 162 N.J. Super. at 261. The "circumstances" may be multiple and must be proven by "clear and convincing" evidence. Benton, supra, 130 N.J. Eq. at 198; Lieberman, supra 37 N.J. Super. at 68.
Broadly stated, the noises which a court of equity normally enjoins are those which affect injuriously the health and comfort of ordinary people in the vicinity to an unreasonable extent.... Thus, the character, volume, frequency, duration, time, and locality are relevant factors in determining whether the annoyance materially interferes with the ordinary comfort of human existence. [Lieberman v. Saddle River Tp., 37 N.J. Super. at 67; emphasis supplied]
To the factors listed in Lieberman may be added several others gleaned from New Jersey cases and cases in other jurisdictions applying a "reasonableness under the circumstances" test. For example, the availability of alternative means of achieving the defendant's objective has been found to be relevant. See Sans, supra 29 N.J. at 448 (change in location of golf tee feasible); Malhame, supra 162 N.J. Super. at 264-266 (plaintiffs failed to prove that alternative fire-siren system wouldn't just transfer nuisance elsewhere). So, also, might the social utility of defendant's conduct, judged in light of prevailing notions of progress and the demands of modern life, be relevant. See Protokowicz v. Lesofski, 69 N.J. Super. 436, 443 (Ch.Div. 1961) *218 (in light of scientific progress, noise from Diesel engine cannot be considered nuisance per se). Whether a given use complies with controlling governmental regulations, while not dispositive on the question of private nuisance, Monzolino v. Grossman, 111 N.J.L. 325, 328 (E. & A. 1933), does impact on its reasonableness. See, e.g., Desruisseau v. Isley, 553 P.2d 1242, 1245-46 (Ariz. App. 1976); 58 Am.Jur.2d, Nuisances, § 30 (1971).
An application of these factors to the present case supports the conclusion that defendants' windmill constitutes an actionable nuisance. As indicated, the noise produced is offensive because of its character, volume and duration. It is a sound which is not only distinctive, but one which is louder than others and is more or less constant. Its intrusive quality is heightened because of the locality. The neighborhood is quiet and residential. It is well separated, not only from commercial sounds, but from the heavier residential traffic as well. Plaintiffs specifically chose the area because of these qualities and the proximity to the ocean. Sounds which are natural to this area  the sea, the shore birds, the ocean breeze  are soothing and welcome. The noise of the windmill, which would be unwelcome in most neighborhoods, is particularly alien here.
The duration of the windmill noise is also significant. Since the prevailing winds keep the unit operating more or less constantly, the noise continues night and day. Interfering, as they do, with the normal quiet required for sleep, nighttime noises are considered particularly intrusive. See Protokowitz v. Lesofski, supra 69 N.J. Super. at 444; Seligman v. Victor Talking Machine Co., 71 N.J. Eq. 697, 700 (Ch. 1906). Since ambient sounds are normally reduced at night, an alien sound is even more offensive then. The sound levels are well documented and clearly exceed permissible limits under the zoning ordinance. Ordinance 11-1981. Independent of the ordinance, the evidence supports the conclusion that the noise is disturbing to persons of ordinary sensibilities. It can and does affect injuriously the health and comfort of ordinary people in the vicinity to an *219 unreasonable extent. Lieberman v. Saddle River Tp., supra 37 N.J. Super. at 67.
When consideration is given to the social utility of the windmill and the availability of reasonable alternatives, the conclusion supporting an injunction is the same. Defendants' purpose in installing the windmill was to conserve energy and save on electric bills. Speaking to the latter goal first, clearly the court can take judicial notice that alternative devices are available which are significantly less intrusive. Evid.R. 9(1). As to its social utility, a more careful analysis is required. Defendants argue that the windmill furthers the national need to conserve energy by the use of an alternate renewable source of power. See, generally, Wind Energy Systems Act of 1980, 42 U.S.C.A., §§ 9201-13, and Public Utility Regulatory Policies Act of 1978, 16 U.S.C.A., § 824a-3. The social utility of alternate energy sources cannot be denied; nor should the court ignore the proposition that scientific and social progress sometimes reasonably require a reduction in personal comfort. Protokowitz v. Lesofski, supra 69 N.J. Super. at 443; Annotation, "Nuisance  Operation of Air Conditioner," 79 A.L.R.3d 320, 328 (1977). On the other hand, the fact that a device represents a scientific advance and has social utility does not mean that it is permissible at any cost. Such factors must be weighed against the quantum of harm the device brings to others. Sans v. Ramsey Golf & Country Club, supra, 29 N.J. at 448-49.
In this case the activity in question substantially interferes with the health and comfort of plaintiffs. In addition to the negative effect on their health, their ability to enjoy the sanctity of their homes has been significantly reduced. The ability to look to one's home as a refuge from the noise and stress associated with the outside world is a right to be jealously guarded. Before that right can be eroded in the name of social progress, the benefit to society must be clear and the intrusion must be warranted under all of the circumstances. Here, the benefits are relatively small and the irritation is substantial. *220 On balance, therefore, the social utility of this windmill is outweighed by the quantum of harm that it creates.
That is not to say that all windmills constitute a nuisance or even that this windmill cannot be modified in a way to justify a different conclusion. Every case must be examined on an individual basis. Given the circumstances here, however, the evidence clearly and convincingly establishes a nuisance and the imposition of an injunction is warranted. Although defendants assert defenses of estoppel, laches and unclean hands, these claims are without factual support and need not be treated further.
With respect to the counterclaim, defendants have failed to prove that plaintiffs' heat pump constitutes an actionable nuisance. While the noise of the pump may at times be as loud as that of the windmill, several factors distinguish it. The operation of the pump is limited in duration and frequency, as it is rarely used and then only for short periods; also, the sound is less alien. In addition, defendants' proofs have failed to clearly and convincingly prove that the pump "unreasonably affects their health and comfort." They complain only of minor disturbances and distractions, rather than nuisances. That is not to say that a heat pump can never be a nuisance, or even that, given more substantial evidence, this particular heat pump could not be deemed a nuisance. It is only to say that in this case, given these proofs, defendants did not meet their burden.

II. Statutory Remedy

N.J.S.A. 40:55D-18 of the Municipal Land Use Law entitles any "interested party" to secure an injunction against a zoning ordinance violation. Since Brigantine's Ordinance 11-1981 sets noise standards for windmills and is part of the city zoning ordinance, its violation is subject to restraint under the statute. Although plaintiffs did not specifically plead a cause of action under N.J.S.A. 40:55D-18, the proofs submitted at trial and in post-trial briefs fully addressed the subject. To the *221 extent necessary, therefore, the case presents an appropriate occasion to conform pleadings to the proofs under R. 4:9-2. See 68th St. Apts. v. Lauricella, 142 N.J. Super. 546, 561, n. 3 (Law Div. 1976), aff'd 150 N.J. Super. 47 (App.Div. 1977).
Defendants' violation of the zoning ordinance is uncontroverted. At all times the windmill operated in violation of the 50 dBA standard. Defendants' response is that the ordinance is arbitrary and unreasonable.
For the purposes of the Municipal Land Use Law an "interested party" is
... in the case of a civil proceeding in any court ... any person, whether residing within or without the municipality, whose right to use, acquire, or enjoy property is or may be affected by any action taken under this act, or whose rights to use, acquire, or enjoy property under this act, ... have been denied, violated or infringed by an action or failure to act under this act. [N.J.S.A. 40:55D-4]
The city's failure to adequately halt the zoning violation by the windmill constitutes a "failure to act" under the Municipal Land Use Act. Therefore, to be deemed interested parties plaintiffs need only have shown that their property rights have been "denied, violated or infringed." Several factors suggest that the showing required is minimal. First, New Jersey's test for standing, particularly in zoning cases, is not a stringent one. See Home Builders League of So. Jersey, Inc. v. Berlin Tp., 81 N.J. 127, 132-33 (1979) (citing 40:55D-4). Second, the legislative history of "interested party" indicates that a potential plaintiff must show merely that he has been denied the reciprocal benefits of a common zoning plan.
The current definition of "interested party" first appeared in N.J.S.A. 40:55-47.1 of the prior municipal land use statute. The Legislature intended that section to give individuals the same right to an injunction afforded municipalities under N.J.S.A. 40:55-47. See Assembly Bill 536 of 1969; see, also, Alpine Borough v. Brewster, 7 N.J. 42 (1951). Accordingly, an interested party, at most, must show the equivalent of what was traditionally described as "special damages," that is, damages *222 "distinct from [those] suffered ... in common with the community at large." Morris v. Haledon, 24 N.J. Super. 171, 179-80 (App.Div. 1952). See, also, Governor's Message re Assembly Bill 536, Dec. 1, 1969; Alpine Borough v. Brewster, supra 7 N.J. at 52; Stokes v. Jenkins, 107 N.J. Eq. 318, 321 (Ch. 1930).
Plaintiffs have clearly suffered special damages. Their proximity to the windmill denies them the equal benefit of enjoyment of their property, and causes them injury greater than that suffered by the general public. See Stokes v. Jenkins, supra at 322. Accordingly, plaintiffs are "interested parties" within the meaning of N.J.S.A. 40:55D-4 and are entitled to an injunction under N.J.S.A. 40:55D-18.
Defendants nevertheless contend that the windmill ordinance is arbitrary and unreasonable. That position is unpersuasive. Defendants argue that the ordinance violates equal protection guarantees by arbitrarily singling out windmills for noise control, and due process because it unreasonably limits windmill noise to 50 dBA while other ambient sounds often rise above that level. The ordinance, however, is a zoning regulation and was promulgated under the police power. Since it is "social" legislation it need be justified only by a showing that, in any state of facts, it reasonably advances a legitimate state purpose. Dandridge v. Williams, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970). This same minimal standard satisfies the principle of substantive due process. See Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934); Hutton Park Gardens v. West Orange, 68 N.J. 543, 560-61 (1975). Thus, a showing that the ordinance reasonably advances a legitimate state purpose would defeat both claims.
Pursuant to a police power statute, the Brigantine ordinance legitimately protects public health and welfare by proscribing excessive noise. Limiting noise from windmills indisputably advances that legitimate purpose and does so in a reasonable way. The claim that "other ambient sounds" may exist above 50 dBA ignores the distinction between noise (unwanted sound) *223 and natural ambient sounds. It is not unreasonable for Brigantine to classify a windmill's sound "noise" and thus limit it. Nor is it unreasonable for the city to attack the noise problem "one step at a time," beginning with windmills, "addressing itself to the phase of the problem which seems most acute to the legislative mind." Williamson v. Lee Optical Co., 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955). Defendant's constitutional claims are thus without merit. It must also be remembered that this ordinance is entitled to a presumption of validity. That presumption "may be overcome by a clear showing that the local ordinance is arbitrary or unreasonable." Quick Chek Food Stores v. Springfield Tp., 83 N.J. 438, 447 (1980). There has been no such showing here.
In conclusion, it is the view of this court that, for a variety of reasons, defendants' windmill constitutes an actionable nuisance. Under the same analysis plaintiffs' heat pump does not. An alternative basis for granting injunctive relief is defendants' violation of the municipal zoning ordinance. An order should be entered accordingly.
NOTES
[1] Following the issuance of the TRO, the manufacturer, the installer and the city were joined as third-party defendants. Each elected not to participate in the trial and agreed to be bound by the result.