**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3374-16T2

RICHARD TUOSTO and
CHERYL TUOSTO,

      Plaintiff-Respondents/
      Cross-Appellants,

v.

THERESE BRADY and
STEPHEN CORUM,

      Defendants-Appellants/
      Cross-Respondents,

v.

BOROUGH OF GLEN RIDGE,
MICHAEL ROHAL, Administrator,
MICHAEL ZICHELLI, Director of
Planning/Deputy Administrator, and
SHEILA BYRON-LAGATTUTA,
Chief of Police,

      Respondents.[1]

_____

[1] The Borough and its officials are not parties in this appeal. Their designation as "respondents" on the caption refers to their status as defendants in appellants' mandamus action.

Argued May 9, 2019 – Decided June 17, 2019

Before Judges Simonelli, Whipple and Firko.

On appeal from Superior Court of New Jersey, Law Division, Essex County, Docket No. L-5696-15.

Jack Thomas Spinella argued the cause for appellants/cross respondents (Nicoll Davis & Spinella LLP, attorneys; Jack Thomas Spinella and Steven C. De Palma, on the briefs).

Jason L. Bittiger argued the cause for respondents/cross-appellants (Bittiger Elias & Triolo PC, attorneys; Jason L. Bittiger, of counsel and on the brief; Michael Colin Feinberg, on the brief).

PER CURIAM

In this dispute between neighbors, plaintiffs Richard Tuosto and Cheryl Tuosto filed a complaint for trespass alleging defendants Therese Brady's and Stephen Corum's chain-linked fence encroached on their property. Defendants counterclaimed, alleging adverse possession and easement by prescription with respect to the fence and that the noise from plaintiffs' two newly installed central air conditioning units was a nuisance. Defendants also asserted a third-party

mandamus action against the Borough of Glen Ridge (Borough) and Borough officials[2] to compel their enforcement of the Borough's noise ordinance.

Defendants appeal from: (1) the October 6, 2016 order severing the mandamus action from the nuisance action; (2) the November 15, 2016 order granting partial frivolous litigation attorney's fees to defendants for defense of the trespass complaint;[3] (3) the March 1, 2017 final judgment dismissing defendants' nuisance claim; and (4) the April 10, 2017 order awarding defendants $4821 for attorney's fees and costs. Plaintiffs cross-appeal from the November 15, 2016 and April 10, 2017 orders. We affirm all orders, but remand to the trial court for entry of an order modifying the amount of the attorney's fees and costs to $4281 to reflect the amount the court actually awarded.

I.

The Properties

Defendants moved to Glen Ridge in 1996. They previously lived in the Gramercy Park section of Manhattan for twenty years, and moved to Glen Ridge

---

[2] We shall sometimes collectively refer to the Borough and Borough officials as the Borough defendants.

[3] In a separate October 6, 2016 order, the court granted summary judgment to defendants and dismissed the trespass complaint with prejudice. In an April 13, 2017 order, the court dismissed defendants' adverse possession and easement by prescription claims as moot. These orders are not subject to this appeal.

A-3374-16T2

because they wanted to live in a quiet place. Corum was retired, but previously worked in the music and sound effects business. He was also a Vietnam veteran. Brady was an attorney who specialized in litigation.

Defendants' lot is approximately 50 feet by 140 feet and their house is approximately twenty feet from plaintiffs' house. Defendants' house was built in 1912 with plaster walls, and they never updated the insulation. The house has three bedrooms on the second floor. Corum's bedroom is in the front of the house on the north side nearest to plaintiffs' house. Corum's bedroom has a window facing plaintiffs' house in which he installs a 5000 BTU window air conditioner from May to October. The window is approximately twenty-two feet from plaintiffs' two central air conditioning units. There is a bathroom in the rear of house on the north side, which also has a window facing plaintiffs' house. The bathroom is across a hallway and approximately ten feet from Corum's bedroom. Brady's bedroom is in the front of the house on the south side, away from plaintiffs' house. The third bedroom, which defendants use as a study, is located in the rear of the house on the south side, away from plaintiff's house.

Plaintiffs moved into their house in August 2013. The south side of their house, which faces defendants' house, has a living room on the first floor and two bedrooms on the second floor.

Plaintiffs' Air Conditioning Units

In 2014, plaintiffs hired Thomas Mastandrea, a licensed heating-ventilation-air conditioning contractor, to install a quiet, energy efficient central air conditioning system. Plaintiffs paid Mastandrea $25,000 to oversee and complete the entire process, including permits, installation, and final inspections. Mastandrea chose to install two Ruud Model UARL-025JEC air conditioning units because they were energy efficient and "one of the quietest on the market" (the units). The units were two-stage units, which were more efficient because they operated at a lower level in stage one and a higher level in stage two.

Mastandrea chose to install the units in plaintiffs' side yard between their house and defendants' house. He applied for a permit and submitted the manufacturer's specifications for the units, which indicated the units generated 71 decibels (dB) of sound in stage one and 74 dB in stage two.

Mastandrea delivered the units to plaintiffs' property in April 2014. When Brady saw an unmarked white panel truck delivering "two large, industrial

looking air conditioning units[,]" she contacted the Borough requesting a stop work order because she was concerned the contractor was unlicensed and the units would violate the Borough's noise ordinance and setback requirements.[4] Brady called the units a "nuisance" and threatened to alert state and federal authorities if the Borough did not take action. On May 9, 2014, Brady sent the Borough's Director of Planning and Deputy Administrator, Michael P. Zichelli, an email that included the American Academy of Audiology noise level chart, which indicated that a sound of 50 decibels (dBA) was equivalent to moderate rainfall and 60 dBA was equivalent to a normal conversation or a dishwasher.

<u>Alleged Noise Impacts on Defendants</u>

Corum claimed plaintiffs operated the units day and night from May to October. On June 17, 2016, Corum made an audio-video recording of the units through the open window of the second floor bathroom, which the trial court viewed, as did we. He testified he made the recording after plaintiffs took corrective measures to lower the noise level, and the sound level on the video was "a pretty a good estimation of" what the units sounded like from the bathroom window.

---

[4] Brady later admitted the setback requirements did not apply to air conditioning units and that Mastandrea was licensed.

A-3374-16T2

Corum testified he did not sleep at all when the units were operating. Corum claimed that although he operated his window air conditioner during the same months plaintiffs operated the units and his air conditioner made noise, that noise did not interfere with his ability to sleep. He testified the noise from the units overpowered his window air conditioner, and he could not move his bedroom somewhere else in the house to escape the noise because it permeated every room, including the basement. He said the noise was "horrendous. You can . . . hear the noise in every single room in the house. It even vibrates. Sometimes it makes the windows even vibrate."

Corum claimed he suffered from extreme stress and irritability, depression, headaches, and apprehension due to the noise from the units and believed the stress from the noise exacerbated his diabetes. He testified he did not suffer from headaches, irritability, or stress prior to the installation of the units and claimed he never had a headache before in his life, even when he was in the military. He admitted he never saw a doctor for any of his symptoms and no doctor informed him that these symptoms were directly related to the noise from the units.

Corum also testified that the noise from the units interfered with defendants' enjoyment of their back deck. He claimed that if defendants ate

dinner on the deck they could not have a conversation at a normal level and had to "basically yell at each other."

Brady testified that the noise from the units "was absolutely unbelievable . . . [a]nd . . . sounded [to her] like . . . [they] were living next to an industrial park." She claimed there was no place in the house to get refuge from the noise because the noise permeated the entire house, vibrated throughout the house, and was "horrendous." Contrary to Corum's description of the sound level on the audio-video recording as "a pretty a good estimation of" what the units sounded like from the bathroom window, Brady testified "the volume [on the audio-video recording] was . . . exceedingly less than what [they] experienced."

Brady claimed the noise from the units gave her headaches, caused her extreme anxiety, made her extremely depressed, and left her "extremely fatigued" because it affected her sleeping and every aspect of her life. She said even earplugs did not help because the noise was "unrelenting." She claimed she never suffered these symptoms prior to installation of the units. She admitted she never saw a doctor for any of her symptoms and no doctor informed her that these symptoms were directly related to the noise from the units.

Defendants believed the only effective way to rectify the noise was to remove or relocate the units, a position they held since before the units were

A-3374-16T2

operational, and a remedy they sought as injunctive relief. They also sought monetary damages of $4000 per month for the eighteen months plaintiffs had used the units, plus an additional unspecified amount.

Richard Tuosto, by contrast, testified that the noise from the units, which were situated below plaintiffs' second-floor bedroom, did not interfere with plaintiffs' sleep or use of their yard. He said he could hear defendants' window air conditioners from inside his house if his windows were open.

Noise Testing

1. Initial Noise Test Results

The Borough's noise ordinance requires that sound may not exceed 65 dBA during the day, from 7:00 a.m. to 10:00 p.m., and 50 dBA during the night, from 10:00 p.m. to 7:00 a.m.[5]

Plaintiffs began operating the units in late May 2014. On June 3, 2014, Brady complained to the Borough about the noise from the units. In response,

_____

[5] The Noise Control Act of 1971 (Act), N.J.S.A. 13:1G-1 to -23, authorized the New Jersey Department of Environmental Protection (NJDEP) to adopt regulations governing noise control. N.J.S.A. 13:1G-4. It also authorized municipalities to adopt noise control ordinances in conformance with the Act and its implementing regulations, N.J.A.C. 7:29-1.1 to -2.12, subject to NJDEP approval. N.J.S.A. 13:1G-21. NJDEP's noise regulations provided that a municipality could adopt a noise control ordinance in accordance with the statewide scheme of noise control if it received written approval from NJDEP. N.J.A.C. 7:29-1.8(a).

on June 6, 2014, representatives from the Essex Regional Health Commission and Bloomfield Department of Health and Human Services conducted a joint noise test. Their daytime noise readings from defendants' property ranged from 53 dBA to 54 dBA, within the 65 dBA daytime sound limit. However, their nighttime noise readings exceeded the 50 dBA nighttime sound limit.

On June 17, 2014, Zichelli advised plaintiffs they could not operate the units during the night because noise from the units exceeded the nighttime sound limit. Brady testified plaintiffs continued to operate the units at nights, which Richard Tuosto denied. In July 2014, Brady sent several emails to the Borough again complaining about the noise from the units. She claimed the Borough did nothing about her complaints

On July 17, 2014, Police Officer Christopher Grogan of the Glen Ridge Police Department took nighttime noise readings from defendants' property line, which measured 53.4 dBA. Between August 2014 and July 2015, Brady sent additional emails to the Borough complaining that plaintiffs continued to operate the units at night, which Richard Tuosto denied.

2. Plaintiffs' Corrective Measures

After Grogan's noise test, plaintiffs took corrective measures to attenuate the sound emanating from the units. Mastandrea advised plaintiffs that placing

noise blankets in the units' compressors and installing a taller fence would reduce the noise level. In July 2014 plaintiffs placed foam compressor blankets in the units, and in September 2014, they installed a six-foot vinyl fence between the units and defendants' house. In June 2015, plaintiffs hung sound absorbing blankets on their house, which Brady referred to as "a baby's quilt." Plaintiffs also set up a "quiet fence" in front of the units, which defendants referred to as "plastic eggshell cartons." Defendants did not believe the corrective measures were effective.

3. Grogan's Second Noise Test Results

On September 7, 2014, Brady sent an email to the Borough advising that, going forward, defendants required notice at least one week prior to allowing entry onto any part of their property for noise tests. Zichelli responded the next day, stating he received Brady's request and would schedule a time that was mutually convenient to all parties.

On July 9, 2015, the Borough informed defendants it would be conducting a noise test on July 13, 2015. On that day and the following day, Brady sent emails to the Borough objecting to the noise test and stating she would not permit anyone to enter her property. Brady testified that she and Corum objected because they did not receive adequate advance notice and did not believe the

11 <span>A-3374-16T2</span>

weather was hot enough for an appropriate test. Chief of Police Sheila Byron-Lagattuta responded that Grogan would not enter defendants' property without permission and the test therefore would be in relation to plaintiffs' permit, not defendants' noise complaints. Byron-Lagattuta advised defendants to contact her to schedule a test concerning their noise complaint.

On July 13, 2015, Grogan took nighttime noise readings from plaintiffs' back yard, near the units, which measured 45.1 dBA, under the 50 dBA sound limit. Brady did not believe Grogan's results were valid because Grogan took the readings from plaintiffs' property instead of defendants' property and noise should be measured from the affected or receiving property. Nevertheless, defendants stipulated to the admissibility of Grogan's report of his nighttime noise test.

### 4. The Permit and Certificate of Approval

The Borough had issued plaintiffs a summons for violating the nighttime sound limit. The Borough later vacated the summons because Grogan's July 13, 2015 noise test showed the units did not violate the nighttime sound limit. The Borough issued plaintiffs a permit and certificate of approval, which allowed them to operate the units at night.

Zichelli testified that he reviewed thirty to fifty permit applications for central air conditioning units in the Borough every year. He explained that the Borough did not usually require a noise test for the installation of central air conditioning units, but did in this case because of defendants' complaints. The certificate of approval issued to plaintiffs explicitly stated it did "not preclude anyone from filing a noise complaint." Zichelli said he did not typically include that language in a certificate of approval.

Because the units had passed the nighttime noise test and plaintiffs had received a certificate of approval, on August 3, 2015, a Glen Ridge police lieutenant sent an email to all Borough police officers advising them to not respond to noise complaints from defendants and instead to enter the complaints into the computer-aided dispatch system.

Defendants' Expert

Defendants' acoustical engineering expert, Jack Zybura, conducted a nighttime noise test on July 13, 2015 at the same time Grogan conducted his test. Zybura took noise readings from the ground on defendants' side of the property line nearest defendants' house, which measured 55 dBA, and from outside the second floor window of defendants' bathroom, which measured 51 dBA.

Zybura testified that the Borough's noise ordinance required noise testing to be conducted in conformance with NJDEP's regulations, specifically, N.J.A.C. 7:29-2.5(a)(2), which requires noise readings to be taken at or within the property line of any affected person. He opined that Grogan's testing did not conform to that regulation because Grogan took measurements from plaintiffs' property. Zybura also questioned whether Grogan's equipment conformed to the noise regulations.

Zybura explained that in addition to overall sound, which was measured in A-weighted decibels because of how the human ear perceived it, sound could be broken down into its component octave band frequencies, which he analogized to separating white light into the different component parts of the rainbow. He further explained that the Borough's noise ordinance had separate sound limits for different octave band frequencies. Zybura measured the sound in the 125 Hertz (Hz) octave band at 70 dB at the property line, and between 62 dBA and 63 dBA at the mid-stair landing window, both of which were above the Borough's nighttime limit for sound in the 125 Hz frequency. Zybura acknowledged that the human ear was most sensitive to sound at frequencies between 1000 Hz and 4000 Hz, and that 125 Hz was a low frequency. For that reason, a reading of 70 dBA in the 125 Hz frequency band was approximately

equivalent to an overall sound reading of 55 dBA, which is what he measured from the ground on defendants' side of the property line nearest defendants' house.

Zybura testified that the sound scale was logarithmic. Although two identical sources making noise at the same time would create double the sound energy, it would not double the perception to the human ear, but instead result in an increase of approximately 3 dBA. A doubling of sound perceptible to the human ear would equate to a roughly 10 dBA increase.

Zybura also testified that the second stage of a two-stage air conditioning unit was generally louder than the first stage. He did not know if the units were operating in the first or second stage when he took his readings, and did not see any window air conditioners operating in defendants' house at that time. He said defendants gave him the manufacturer's specifications for the units, but he did not use that information in his analysis.

Zybura agreed that the Borough's 65 dBA daytime sound limit was meant to protect people having a normal conversation at a distance of three feet. He testified that the noise from the units at the levels he measured would not interfere with normal conversation, and agreed that the noise from the units would not affect defendants having a conversation on their back deck. This

contradicted Corum's testimony that if defendants ate dinner on the deck they had to yell at each other to have a normal conversation.

Zybura agreed that the Borough's 50 dBA nighttime sound limit was meant to protect sleep with the windows partially open. He also agreed that closing the bathroom window where he took the sound readings would reduce the sound level by over 2 dBA. He clarified there are different indoor versus outdoor noise limits and different procedures to measure noise outdoors versus indoors. However, he did not take any sound readings from inside defendants' house.

Zybura testified that a window air conditioner would likely mask external sounds, meaning that a person in the room would notice the sound from the window air conditioner more than sounds from outside. Corum did not make a recording of the noise from his window air conditioner and Zybura did not measure the sound from the window air conditioner.

Zybura testified that the corrective measures plaintiffs took are ordinarily effective, but he offered no opinion as to the effectiveness of the corrective measures plaintiffs took. He also testified he was not qualified to opine about whether the noise from the units affected defendants' mental or physical health.

16

The court held defendants failed to prove by clear and convincing evidence that the noise from the units was more than a mere annoyance. The court noted that Corum testified the noise on the audio-video recording was a good estimation of what the units sounded like, whereas Brady testified that the actual noise was louder than the recording. The court listened to the recording and found the noise was not horrendous and "[c]ertainly . . . not loud enough to cause the windows to vibrate." The court also noted defendants produced no other recording consistent with Brady's characterization of the noise.

The court found that Zybura's and Grogan's nighttime noise test results were inconsistent. Nevertheless, the court concluded that even without considering Grogan's test results, Zybura's test results would not result in the level of noise that would vibrate the house and windows, as defendants testified. The court found that Zybura's nighttime reading of 55 dBA was less than the sound of a "normal conversation," which was approximately 60 dBA.

The court found "unbelievable" defendants' testimony that they never suffered from stress, headaches, or anxiety prior to the installation of the units, particularly in light of their background as a lawyer and a war veteran who previously resided in Manhattan. The court found defendants did not seek any

17

medical treatment despite their complaints about the effects of the noise from the units. The court, however, was careful to note it was not making a finding that expert testimony must be produced to prove a nuisance. Rather, the court emphasized defendants were not credible witnesses.

## II.

On appeal, defendants contend the court erred by finding they failed to prove the noise from the units was a nuisance. They argue that Zybura's nighttime noise test proved the units violated the Borough's noise ordinance, and a violation of a municipal noise ordinance is a per se nuisance. We disagree.

Our review of a trial court's determination in a non-jury case is limited. Scannavino v. Walsh, 445 N.J. Super. 162, 167 (App. Div. 2016). We will not disturb a trial court's factual findings "unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Ibid. (quoting D'Agostino v. Maldonado, 216 N.J. 168, 182 (2013)). Our review of legal issues is de novo. Ibid.

"The essence of a private nuisance is an unreasonable interference with the use and enjoyment of land." Sans v. Ramsey Golf & Country Club, Inc., 29 N.J. 438, 448 (1959). To establish a noise nuisance, a complaining party must

prove by clear and convincing evidence: "(1) injury to the health or comfort of ordinary people to an unreasonable extent, and (2) unreasonableness under all the circumstances, particularly after balancing the needs of the maker to the needs of the listeners." Traetto v. Palazzo, 436 N.J. Super. 6, 12 (App. Div. 2014) (quoting Malhame v. Borough of Demarest, 162 N.J. Super. 248, 261 (Law Div. 1978)).

Under the first prong, a "mere annoyance" such as the interruption of a conversation or occasional disturbance of sleep is insufficient to establish an actionable injury. Id. at 13 (quoting Malhame, 162 N.J. Super. at 261). A cognizable injury includes "temporary physical pain" or "more than usual anxiety and fright." Id. at 12-13 (quoting Malhame, 162 N.J. Super. at 263). It is an objective standard measured "not according to exceptionally refined, uncommon or luxurious habits of living, but according to the simple tastes and unaffected notions generally prevailing among plain people." Sans, 29 N.J. at 449 (quoting Sans v. Ramsey Golf & Country Club, Inc., 50 N.J. Super. 127, 134 (App. Div. 1958)). "Injury to a particular person in a peculiar position or of specially sensitive characteristics will not render the noise an actionable nuisance." Benton v. Kernan, 130 N.J. Eq. 193, 198 (E. & A. 1941) (quoting Tortorella v. H. Traiser & Co., 188 N.E. 254, 256 (Mass. 1933)).

If the complaining party establishes the first prong, the second prong requires the court to balance the utility of the conduct generating the noise with the harm to the complaining party. Traetto, 436 N.J. Super. at 13. Under the second prong, "[t]he question is not simply whether a person is annoyed or disturbed, but whether the annoyance or disturbance arises from an unreasonable use of the neighbor's land or operation of his business." Sans, 29 N.J. at 449. Relevant factors for a court to consider include "the character, volume, frequency, duration, time, and locality" of the noise. Lieberman v. Twp. of Saddle River, 37 N.J. Super. 62, 67 (App. Div. 1955). Also relevant, though not dispositive, is whether the conduct and the noise it generates comply with controlling government regulations. Traetto, 436 N.J. Super. at 13.

Defendants rely on Rose v. Chaikin, 187 N.J. Super. 210 (Ch. Div. 1982), to support their argument that violation of a municipal noise ordinance is a per se nuisance. However, trial court opinions do not constitute precedent and are not binding on this court or the trial court. Brundage v. Estate of Carambio, 195 N.J. 575, 593 (2008); S & R Assocs. v. Lynn Realty Corp., 338 N.J. Super. 350, 355 (App. Div. 2001).

Nevertheless, Rose does not support defendants' argument. In Rose, 187 N.J. Super. at 214, 218-20, the court found the noise from a windmill constructed

ten feet from the plaintiffs' property was a nuisance. The court recognized that whether the noise complied with controlling governmental regulations, such as a local noise ordinance, was a factor to consider when determining whether it was a nuisance. Id. at 218. The court cautioned, however, that this factor was "not dispositive on the question of private nuisance[.]" Ibid. Ultimately, the court considered several factors and found the plaintiffs established the windmill was a nuisance "independent" of any violation of the noise ordinance. Id. at 218-19.

Contrary to defendants' argument, even if Zybura's nighttime noise test showed the units violated the Borough's noise ordinance, that alone was not sufficient to prove a nuisance. The proper approach when determining whether noise is a nuisance is to apply the two-part test elucidated in Traetto. The court applied the two-part test here and found defendants failed to prove by clear and convincing evidence that the noise from the units was more than a mere annoyance. Because the court applied the proper test, and because the record amply supports the court's findings, we discern no reason to reverse.

### III.

Defendants contend for the first time on appeal that the court erred in allowing Mastandrea and Zichelli to testify because their testimony was

irrelevant. Because defendants did not object to the testimony on relevancy grounds, we review this issue for plain error. See R. 1:7-2 and R. 2:10-2. "[T]he question of whether plain error occurred depends on whether the error was clearly capable of producing an unjust result. Relief under the plain error rule, [Rule] 2:10-2, at least in civil cases, is discretionary and 'should be sparingly employed.'" Baker v. Nat'l State Bank, 161 N.J. 220, 226 (1999) (quoting Ford v. Reichert, 23 N.J. 429, 435 (1957)).

Relevant evidence is presumptively admissible. N.J.R.E. 402. Evidence is relevant if it has "a tendency in reason to prove or disprove any fact of consequence to the determination of the action." N.J.R.E. 401. To determine whether evidence is relevant, courts look at "the logical connection between the proffered evidence and a fact in issue." Verdicchio v. Ricca, 179 N.J. 1, 33 (2004) (quoting State v. Hutchins, 241 N.J. Super. 353, 358 (App. Div. 1990)). Courts determine "whether the evidence proffered 'renders the desired inference more probable than it would be without the evidence.'" Ibid. (quoting State v. Davis, 96 N.J. 611, 619 (1984)). The "test is broad and favors admissibility." Davis, 96 N.J. at 619 (quoting State v. Deatore, 70 N.J. 100, 116 (1976)).

We first note that defendants do not assert any prejudice from the admission of the now complained-of testimony. Nevertheless, Mastandrea's

22

testimony was relevant to the issues in this case. He testified Richard Tuosto wanted a quality unit for efficiency purposes and a unit that was going to be quiet inside and out the house, and he selected the specific units because they were one of the quietest on the market and decided where to install them. Mastandrea testified about the installation and permit processes, and confirmed that that all of the installation work was in accordance with the permit and the units were functioning properly. He also advised plaintiffs on corrective measures they could take to reduce the noise from the units. Indeed, defendants admit that Mastandrea's testimony was relevant to the extent he applied for the permit on plaintiffs' behalf and included the manufacturer's specifications with the permit application.

Zichelli's testimony was also relevant to the issues in this case. He testified about the Borough's permit process for installation of a residential central air conditioning unit, the Borough's policy regarding location of central air conditioning units on an applicant's property, and the Borough's customary practice of conducting noise tests for newly installed residential central air conditioning units. He also testified about the Borough's review of plaintiffs' permit application, and confirmed that plaintiffs' complied with all of the Borough's requirements for installing and operating the units.

Zichelli also testified he received thirty to fifty permit applications per year for central air conditioning units. The number of homes in the Borough with central air conditioning units was relevant to the second element of the nuisance test, which includes consideration of the social utility of the conduct generating the noise. Further, contrary to defendants' assertion that Zichelli's testimony may have confused the court with respect to the Borough's construction code and noise ordinance, Zichelli explained that the construction code and noise ordinance were two separate and distinct issues. Accordingly, there was no error, let alone plain error, in the admission of Mastandrea's and Zichelli's testimony.

IV.

Defendants contend the court erred by finding their testimony was not credible. We reject this contention.

We "do not weigh the evidence, assess the credibility of witnesses, or make conclusions about the evidence." Mountain Hill, LLC v. Twp. of Middletown, 399 N.J. Super. 486, 498 (App. Div. 2008) (quoting State v. Barone, 147 N.J. 599, 615 (1997)). In particular, we "are not in a good position to judge credibility and ordinarily should not make new credibility findings." Ibid. "[A] trial judge who observes witnesses and listens to their testimony,

develops 'a feel of the case' and is in the best position to 'make first-hand credibility judgments about the witnesses who appear on the stand.'" Slutsky v. Slutsky, 451 N.J. Super. 332, 344 (App. Div. 2017) (quoting N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008)). "In contrast, review of the cold record on appeal 'can never adequately convey the actual happenings in a courtroom.'" Ibid. (quoting N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448 (2012)).

Defendants argue the court's credibility findings were improper because it found that—as a class—former residents of Manhattan, Vietnam veterans, and attorneys were not credible. Defendants misunderstand the basis of the court's credibility findings. The court did not find defendants' testimony unbelievable because they were members of any particular class. Instead, the court disbelieved their testimony that as longtime residents of Manhattan they had never before suffered from stress, anxiety, or headaches. Likewise, the court found it unbelievable that both a lawyer and a war veteran, who went into a career in music and sound effects, never experienced any negative effects from noise until hearing the noise from the units.

Defendants assert that the court was obligated to accept their testimony about the impact of the noise because their testimony was not refuted. The court,

however, found defendants' testimony was not supported by the audio-video recording and was counter to that of their own expert. The record supports that finding. For instance, Corum testified defendants had to yell at each other to have a conversation on their back deck. Zybura testified, however, that the noise from the units would not interfere with defendants having a normal conversation on their back deck. Zybura also testified that defendants' window air conditioners would mask the sound from the units, and defendants would notice the sound from the window air conditioners more than the sound coming from outside, which was contrary to defendants' testimony. Further, there was no evidence supporting defendants' claim that the noise level Zybura measured was "horrendous" and caused the house and windows to vibrate. Accordingly, we find no error in the court's credibility determination.

## V.

Defendants contend the court erred by failing to admit the manufacturer's specifications for the units during defendants' case in chief. This contention lacks merit.

"When a trial court admits or excludes evidence, its determination is 'entitled to deference absent a showing of an abuse of discretion, i.e., [that] there has been a clear error of judgment.'" Griffin v. City of E. Orange, 225 N.J. 400,

413 (2016) (alteration in original) (quoting State v. Brown, 170 N.J. 138, 147 (2001)). "Thus, we will reverse an evidentiary ruling only if it 'was so wide off the mark' that a manifest denial of justice resulted." Ibid. (quoting Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 492 (1999)).

The court initially declined to admit the manufacturer's specifications on hearsay grounds, but permitted defendants to provide limited testimony about the specifications. After Mastandrea testified that he submitted the manufacturer's specifications with the permit application, the court ruled the specifications were admissible as an adoptive admission under N.J.R.E. 803(b)(2). Thus, it is difficult to discern how defendants were prejudiced.

In any event, the court's the initial decision to preclude the manufacturer's specifications on hearsay grounds was correct. Hearsay is an oral or written statement made by someone other than the testifying witness that is offered to prove the truth of the matter asserted. N.J.R.E. 801. Hearsay is admissible as an adoptive admission, however, if it is "a statement whose content the party had adopted by word or conduct or in whose truth the party has manifested belief[.]" N.J.R.E. 803(b)(2). To qualify as an adoptive admission, the party seeking to introduce the statement must prove that the other party: (1) was aware

27

of and understood the statement, and (2) assented to the statement.  <u>McDevitt v. Bill Good Builders, Inc.</u>, 175 N.J. 519, 529-30 (2003).

The manufacturer's specifications were hearsay because defendants were offering the document to prove the units produced noise in the 71 dB to 74 dB range.  It was only after Mastandrea testified he submitted the specifications with the permit application that court found the document qualified as an adoptive admission, an exception to the hearsay rule under N.J.R.E. 803(b)(2), <u>McDevitt</u>, 175 N.J. at 529-30, and admitted it into evidence.  We discern no abuse of discretion in court court's ruling.

Defendants also argue the court erred by failing to rely on the manufacturer's specifications in its opinion.  However, the key issue in the nuisance trial, as defense counsel admitted, was not the manufacturer's specifications, but the noise defendants were receiving on their property.  There were four nighttime noise tests of the units, including one by Zybura, and the highest sound reading was 54 dBA.  Zybura testified he did not rely on the manufacturer's specifications in rendering his opinion, and there was no evidence that the units ever generated between 71 dBA and 74 dBA of sound.  Thus, there was no reason for the court to rely on the manufacturer's specifications.

A-3374-16T2

## VI.

Defendants contend the court erred by severing the mandamus action from the nuisance action. We disagree.

In ordering severance, the court reasoned that even if the units violated the Borough's noise ordinance, it was insufficient evidence on which to grant mandamus or prove a nuisance. The court noted that the nuisance trial would require testimonial evidence about numerous issues not relevant to the mandamus action, including why the plaintiffs located the units where they did and if there were any alternatives. The court also noted that a mandamus action, by contrast, was a "simple" and "straight forward . . . bench trial" with "no money involved." The court was not willing "to drag the [Borough defendants] through this nightmare of a fight between neighbors" in the nuisance trial, and "make the taxpayers sit and pay to observe" the trial when plaintiffs and defendants "don't even agree on what day of the week it is half the time."

A trial court "has broad case management discretion." Lech v. State Farm Ins. Co., 335 N.J. Super. 254, 260 (App. Div. 2000). To that end, Rule 4:38-2(a) instructs that "[t]he court, for the convenience of the parties or to avoid prejudice, may order a separate trial of any claim, cross-claim, counterclaim,

third-party claim, or separate issue, or of any number of claims, cross-claims, counterclaims, third-party claims, or issues."

Rule 4:30 similarly provides that "[a]ny claim against a party may be reserved or severed and proceeded with separately by court order." When deciding whether severance is warranted, courts consider whether "the same evidence would have been proffered whether the cases had been tried separately or jointly." Rendine v. Pantzer, 141 N.J. 292, 309 (1995). The decision whether to sever a claim is left "to the sound exercise of a trial court's discretion." Id. at 310.

The court did not abuse its discretion in ordering severance. The legal elements of a nuisance action differ from those of a mandamus action. A nuisance requires proof by clear and convincing evidence of (1) unreasonable injury to ordinary people, and (2) unreasonableness under all of the circumstances after balancing the utility of the conduct generating the noise with the harm to the complaining party. Traetto, 436 N.J. Super. at 12-13. Mandamus, by contrast, is an action "(1) to compel specific action when the duty is ministerial and wholly free from doubt, and (2) to compel the exercise of discretion, but not in a specific manner." Vas v. Roberts, 418 N.J. Super. 509, 522 (App. Div. 2011) (quoting Loigman v. Twp. Comm. of Middletown, 297

30                                                                      A-3374-16T2

N.J. Super. 287, 299 (App. Div. 1997)). The differing legal standards for a nuisance action versus mandamus action, and the different evidence needed to prove each cause of action, provided a sufficient basis for the court to order severance. Accordingly, severance of the mandamus and nuisance actions was proper.

VII.

Defendants contend the court erred by failing to find plaintiffs' trespass complaint was frivolous when it was filed, and the court should have awarded defendants more frivolous litigation attorney's fees. On cross-appeal, plaintiffs argue the court erred by finding their trespass complaint was frivolous and awarding any attorney's fees. We reject both arguments.

On April 15, 2016, defendants served an expert's report from a licensed surveyor, which confirmed defendants' chain-linked fence did not encroach on plaintiffs' property. On May 6, 2016, defense counsel sent plaintiffs' counsel a safe-harbor letter pursuant to Rule 1:4-8 demanding that plaintiffs withdraw their trespass complaint or face frivolous litigation sanctions. Plaintiffs did not do so.

On July 22, 2016, defendants filed a motion for summary judgment on their nuisance claim and on plaintiffs' trespass complaint. In an October 6, 2016

order, the court granted defendants' motion as the trespass claim and dismissed that claim with prejudice. The court denied summary judgment on defendants' nuisance claim.

In October 2016, defendants filed a motion for frivolous litigation attorney's fees pursuant to Rule 1:4-8 and N.J.S.A. 2A:15-59.1. In a November 15, 2016 order, the court granted defendants' motion in part. The court found plaintiffs' trespass complaint was not frivolous when filed, but became frivolous when plaintiffs became aware through discovery that defendants' chain-linked fence did not encroach on their property. The court concluded that plaintiffs should have withdrawn their complaint at that time rather than forcing defendants to incur attorney's fees and costs associated with defendant' motion for summary judgment. The court explained it would award attorney's fees related solely to that portion of defendant' summary judgment motion regarding plaintiffs' trespass claim for the period July 22, 2016 to October 22, 2016, and directed defendants to file a second motion for frivolous litigation sanctions with appropriate documentation of their attorney's fees.

Defendants subsequently filed a motion seeking $17,060.91 in attorney's fees and costs relating to the defense of the trespass claim. They had retained new counsel, but relied on a certification of services from their prior counsel.

A-3374-16T2

Prior counsel attached invoices to his certification, and next to the majority of the entries was written "1/2," indicating defendants were seeking one-half of the billed amount for those entries.

The court agreed with plaintiffs that prior counsel's certification and invoices were insufficient because they did not contain any explanation for the "1/2" notations. However, the court was able to calculate a reasonable fee award based on the invoices. With respect to preparing the summary judgment motion, prior counsel billed $8785 on one invoice, and $1975 on another invoice. The court found only one-fourth of the summary judgment motion addressed the trespass claim, and consequently awarded one-fourth of those amounts, $2,196.25 and $493.75 respectively, instead of the one-half defendants sought. The court did not award fees for defendants' reply brief because it was unable to determine how much of the billed time related to the trespass claim. Prior counsel billed $1365 for oral argument on the summary judgment motion. The court found that one-half of the argument focused on the trespass claim, and awarded one-half of that amount, or $682.50.

The court explained that because it had granted defendants' prior motion for frivolous litigation sanctions in part and denied it in part, it would not award defendants all of the fees they sought. The court did not award fees for preparing

33

prior counsel's certification and invoices, or arguments related thereto, because it had denied that portion of the motion. Instead, the court found that prior counsel's invoice entries for oral argument on the sanctions motion, $770, and oral argument preparation, $140, were reasonable, and awarded those amounts. The court added all of the amounts awarded and rounded the total to $4281; however, the April 10, 2017 order incorrectly awarded defendants $4821.

Rule 1:4-8 permits the court to issue sanctions, including attorney's fees, in connection with frivolous litigation. The term "frivolous" has been "strictly construed" to avoid limiting access to the courts. First Atl. Fed. Credit Union v. Perez, 391 N.J. Super. 419, 432-33 (App. Div. 2007). A claim is frivolous only if "no rational argument can be advanced in its support, or it is not supported by any credible evidence, or it is completely untenable." United Hearts, LLC v. Zahabian, 407 N.J. Super. 379, 389 (App. Div. 2009) (quoting Perez, 391 N.J. Super. at 432). A court will not award attorney's fees if a party has a "reasonable and good faith belief in the merit of the cause[.]" Ibid. (first alteration in original) (quoting Perez, 391 N.J. Super. at 432).

An attorney has an obligation to withdraw or correct a complaint if "reasonable opportunity for further investigation or discovery indicates insufficient evidentiary support[.]" R. 1:4-8(a)(3). Thus, even if litigation is

not frivolous when the complaint is filed, it may become so if a party continues to prosecute a meritless claim because the "requisite bad faith or knowledge of lack of well-groundedness may arise during the conduct of the litigation." United Hearts, 407 N.J. Super. at 390 (quoting Iannone v. McHale, 245 N.J. Super. 17, 31 (App. Div. 1990)). In those cases, courts will award fees only for expenses incurred after the litigation became frivolous. See DeBrango v. Summit Bancorp, 328 N.J. Super. 219, 228-30 (App. Div. 2000) (finding that litigation became frivolous after plaintiffs learned information in discovery and awarding fees prospectively from that date). Otherwise, "[i]f costs and fees were awarded for activity preceding the time when litigation became frivolous, we would discourage filing of complaints that were reasonably based, but required some discovery for proper development." Id. at 230.

We review the court's decision on a motion for frivolous litigation sanctions under an abuse-of-discretion standard. McDaniel v. Man Wai Lee, 419 N.J. Super. 482, 498 (App. Div. 2011). Reversal is warranted "only if [the decision] was not premised upon consideration of all relevant factors, was based upon consideration of irrelevant or inappropriate factors, or amounts to a clear error in judgment." Ibid. (quoting Masone v. Levine, 382 N.J. Super. 181, 193 (App. Div. 2005)).

Defendants argue the court erred by finding plaintiffs' complaint was not frivolous when it was filed. However, plaintiffs based their trespass complaint on a survey they believed showed the chain-linked fence encroached on their property, and attached that survey to the complaint. Although the survey included a disclaimer that it was "not for construction purposes," it still provided plaintiffs with a good faith basis to assert their trespass claim. Thus, the court's finding that plaintiffs' complaint was not frivolous when filed was not an abuse of discretion.

Plaintiffs argue the court erred by finding their litigation became frivolous after they decided not to retain an expert to rebut defendants' expert surveyor. Plaintiffs do not contend they had evidence to support their trespass claim, but instead offer three arguments for why they were not required to withdraw their complaint. First, they claim they did not know defendants were claiming ownership of the property on which the chain-linked fence was located because defendants never pled ownership by title or quiet title as a defense or counterclaim in their answer. Defendants' answer, however, stated they owned the property on which the fence was located. In addition, as the court found, defendants' safe harbor letter made it clear defendants owned the property on

which the fence was located and had ample proof thereof, which plaintiffs acknowledged in their opposition to defendants' motion for summary judgment.

Second, plaintiffs contend they were not required to withdraw their trespass complaint unless and until defendants withdrew their counterclaims for adverse possession and easement by prescription. However, in order to prove their trespass claim, it was plaintiffs' burden to show the fence encroached on their property. Defendants were under no obligation to dismiss their counterclaims before plaintiffs dismissed their trespass claim. As the court recognized, defendants' counterclaims would only become relevant if plaintiffs first proved they owned the property on which the fence was located, which they did not do.

Third, plaintiffs maintain they attempted to settle the matter and withdraw their trespass complaint, but defendants refused. However, as the court found, plaintiffs never made an unconditional offer to withdraw their trespass complaint. Not only does the record support the court's finding, plaintiffs' counsel admitted as much at oral argument of the summary judgment motion. Plaintiffs could and should have unilaterally withdrawn their trespass complaint once they acknowledged defendants owned the property on which the fence was

located. Indeed, under Rule 1:4-8(a)(3) plaintiffs were obligated to do so once they knew their trespass claim lacked any evidentiary support.

The parties also present contrary arguments regarding the sufficiency of prior counsel's certification. Defendants argue the certification was sufficient, and they were entitled to all of the fees claimed therein. Plaintiffs counter the certification was so deficient that the court should not have awarded any attorney's fees.

Rule 4:42-9(b) requires that an application for attorney's fees "be supported by an affidavit of services addressing the factors enumerated by RPC 1.5(a)." Those factors include:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
>
> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
>
> (3) the fee customarily charged in the locality for similar legal services;
>
> (4) the amount involved and the results obtained;
>
> (5) the time limitations imposed by the client or by the circumstances;
>
> (6) the nature and length of the professional relationship with the client;

A-3374-16T2

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; [and]

(8) whether the fee is fixed or contingent.

[RPC 1.5(a).]

"When a party is entitled to attorney's fees for only some of the work performed, the relevant services should be identified or a reasonable explanation made for the failure to do so."  Ricci v. Corp. Express of the E., Inc., 344 N.J. Super. 39, 48 (App. Div. 2001).

The record supports the court's finding that prior counsel's certification did not sufficiently distinguish between covered fees incurred defending against plaintiffs' trespass claim, and non-covered fees.  The invoices simply listed "1/2" next to numerous entries, without any attempt to delineate the actual time counsel spent on the trespass claim in each instance.

Plaintiffs are incorrect, however, that defendants are therefore entitled to no fees.  The court, using the invoices, was able to determine the approximate amount of time counsel had spent on various tasks.  For example, the court found that the trespass claim comprised one-fourth of defendants' summary judgment motion, and awarded one-fourth of the fees incurred by defendants for that motion.  The court also listened to prior oral arguments, determined the proportional amount of time spent arguing about the trespass claim in each

instance, and then awarded that portion of the total fee to defendants. For instances in which the court was unable to determine the proportional amount of time defendants' prior counsel spent on certain tasks, including defendants' summary judgment reply brief and their sanctions motion, the court appropriately did not award any fees.

The court considered and rejected the same arguments the parties advance on appeal. The court did not abuse its discretion with respect to the frivolous litigation attorney's fees, and we defer to its ruling. However, we remand to the court to enter an order modifying the attorney's fee award to $4281.

## VIII.

Lastly, defendants contend the court erred by: (1) admitting Grogan's July 13, 2015 nighttime noise test results into evidence; (2) finding plaintiffs' corrective measures were successful in reducing the noise to a level in compliance with the Borough's noise ordinance; (3) requiring defendants to present medical testimony to prove a nuisance; (4) failing to award defendants nuisance damages; and (5) the court erred by accepting "junk science" presented by plaintiffs. We have considered these contentions in light of the record and applicable legal principles and conclude they are without sufficient merit to

warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). However, we make the following brief comments.

(1) Grogan's July 13, 2015 nighttime test results were admitted into evidence as a defense exhibit and defendants stipulated to their admissibility. Although Grogan was on plaintiffs' witness list and defendants believed he would testify on plaintiffs' case in chief, when defendants became aware he would not testify they did not object to the admissibility of his test results or withdraw their stipulation. Thus, the doctrine of invited error bars defendants from challenging the admissibility of the test results on appeal. Brett v. Great Am. Recreation, Inc., 144 N.J. 479, 503 (1996). Nevertheless, the court did not rely on Grogan's test results in its opinion.

Further, "[t]he absence of an objection suggests that trial counsel perceived no error or prejudice, and, in any event, prevented the trial judge from remedying" the issue. Bradford v. Kupper Assocs., 283 N.J. Super. 556, 573-74 (App. Div. 1995). If defendants had objected at trial, plaintiffs "could have taken steps to satisfy any evidentiary requirements needed for the admission of the documents or presented a witness or witnesses in place of the documents." N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 341 (2010). This concern is heightened here because the test results likely were admissible as

business records under N.J.R.E. 803(c)(6) and/or as public records under N.J.R.E. 803(c)(8). Indeed, plaintiffs were prepared to call Grogan if necessary. Defendants' failure to object deprived plaintiffs of the opportunity to overcome that objection and deprived the court of the opportunity to rule on defendants' objection.

(2) The court made no finding that the corrective measures plaintiffs took were successful in reducing the noise from the units to a level in compliance with the Borough's noise ordinance. Rather, the court found plaintiffs spent approximately $1000 on corrective measures in an attempt to attenuate the noise, including constructing a vinyl fence, installing a quiet fence, and using sound blankets. The court also recognized that defendants believed those measures were not effective. In addition, the court stated that Zybura testified the corrective measures plaintiffs took are ordinarily effective but did not offer an opinion as their effectiveness. The court also noted that Zybura's and Grogan's nighttime noise tests were conducted subsequent to the implementation of the corrective measures.

(3) The court did not require defendants to present medical testimony to prove a nuisance. The court found defendants never sought medical treatment for the stress, headaches, or anxiety they claimed to experience as the result of

A-3374-16T2

the noise from the units. The court recognized, however, that medical testimony was not necessary in a nuisance case and explained it was "not making a finding that expert testimony must be produced in proving this issue." Instead, the court emphasized it was ruling against defendants because it found their testimony was not credible.

(4) Defendants did not prove their nuisance claim. As the losing party, they are not entitled to nuisance damages.

(5) Defendants' "junk science" argument is unclear, but appears to revolve around the fact that plaintiffs did not present an expert and that plaintiffs' counsel asked Zybura hypothetical questions. Plaintiffs were not required to present expert testimony. Defendants, as the complaining party, bore the burden of proving the noise from the units was a nuisance. Traetto, 436 N.J. Super. at 12. The record amply supports the court's conclusion that defendants failed to meet that burden.

In addition, N.J.R.E. 705 contemplates the use of hypothetical questions when questioning an expert witness. Defendants did not object to the questions posed by plaintiffs' counsel to Zybura, which "suggests that [defense] counsel perceived no error or prejudice[.]" Bradford, 283 N.J. Super. at 573-74.

Affirmed. This matter is remanded to the trial court to enter an order modifying the attorney's fee award to $4281.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-3374-16T2